No. 83-285

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

_____

STATE OF MONTANA,

        Plaintiff and Respondent,

-vs-

DONALD DEAN GRANT,

        Defendant and Appellant.

_____

APPEAL FROM: District Court of the Twentieth Judicial District,
           In and for the County of Lake,
           The Honorable Robert Holter, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Skedd, Ashley, McCabe & Weingartner; J. Mayo Ashley
        argued, Helena, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
        Jim Scheier argued, Asst. Atty. General, Helena
        John R. Frederick, County Attorney, Polson, Montana

_____

              Submitted: January 23, 1986

                Decided: April 22, 1986

Filed: APR 22 1986

_____
              Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

Donald Dean Grant, the defendant, appeals his convictions for deliberate homicide and attempted deliberate homicide following a jury trial. He raises issues concerning the alternate juror's presence with other jurors after the submission of the case; the conduct of the prosecutor, defense counsel and the District Court Judge; the admissibility of several items of evidence; the adequacy of the information; and the effectiveness of defense counsel's representation. We affirm.

Two out-of-state motorcyclists, Jay Witteman and Carl Warbitsky, arrived in Arlee, Montana, sometime after 3:30 a.m. on July 17, 1982. They stopped at Grant's Place, a restaurant on Highway 93, to ask a group of people standing in the parking lot where they could find a place to camp. The four people in the group were Latricia Rogers, David Sanchez, Robert Jones, and the defendant. Grant spoke with the eventual victims and directed them to a gravel pit south of Arlee next to Highway 93 as a place to camp.

After the motorcyclists headed south, Grant told Sanchez, and possibly Jones, that they should get a gun and go to the gravel pit where they could shoot and kill the campers and steal the motorcycle. Grant said he had been in the army and knew how to kill people. Sanchez thought he was joking. After this conversation, Jones started home. Grant asked him to wait. Sanchez then saw Grant and Jones drive south on 93 toward the gravel pit in Grant's car.

Jones testified concerning the events which occurred after they left the parking lot. They went to Grant's

2

residence where he lived with his mother and stepfather. Grant got a rifle and five shells and told Jones that he knew where the motorcyclists were camped and that they should go out and find them. Grant took the gun and he and Jones left the residence in Grant's car and headed toward the gravel pit. When they arrived at the gravel pit, Grant searched for the tent and stopped a short distance away from it. While still in the car, he told Jones, "I'm going to kill them." Jones did not think he meant it. They got out of the car and Grant gave Jones the gun. After Jones refused to fire it, Grant grabbed it from him and fired four shots in rapid succession into the tent. Jones testified he heard sounds coming from the tent: "ow . . . ow." They got back into the car and returned to Arlee. Sanchez and Rogers both saw Grant's car drive past them heading north at a high rate of speed.

Grant and Jones then stopped at the Tepee Village Cafe, north of Arlee, where they had coffee. Linda Schlemmer, Grant's aunt, served them. She testified that she heard some shots while they were in the cafe. After a short time, Grant and Jones left the cafe and returned to the gravel pit. According to Jones, Grant said, "I got one of them. I got to cut the other guy's throat." Grant then took a knife and they walked toward the tent. Jones stayed about 60 yards away but Grant moved closer and threw rocks at the tent. He told Jones he saw someone move so Grant and Jones ran across the gravel pit and a field, ending up near Highway 93. Jones refused to return to the gravel pit with Grant to get the car. Grant told Jones to tell the police his car had been stolen. After Jones went home, Grant returned to the cafe and told his aunt that his car had been stolen.

Grant retrieved his car from the gravel pit area the next morning after reporting to one of the investigating officers at the scene that it had been stolen. Grant also gave authorities what later proved to be a substantially false statement concerning the theft of his car and his movements and activities during the early morning hours of July 17, 1982.

Two of the bullets from the .300 Savage rifle fired by Grant struck Witteman. He died as a result of shock and hemorrhage caused by the gunshot wounds. Warbitsky, the other occupant of the tent, had been momentarily awakened by the sound of gunfire and a departing car, but he went back to sleep. Warbitsky later reawoke when the rocks struck the tent. Upon hearing the rocks, he attempted, unsuccessfully, to awaken Witteman. Warbitsky got out of his sleeping bag, put on his boots, and emerged from the tent. He saw two figures some distance from the tent, moving away through the gravel pit. He grabbed his jacket from the tent and chased the two fleeing figures, but was unable to catch them. On his way back to the tent, some people in a van approached Warbitsky. He explained what had happened and received a ride back to the campsite. Upon arriving at the tent, Warbitsky and the others in the van discovered that Witteman was dead, so they contacted the authorities.

The State charged Grant with deliberate homicide (count I) for Witteman's death and attempted deliberate homicide (count II) for putting Warbitsky in fear of his life. Trial began on November 16, 1982 and concluded on December 7, 1982, with the jury finding Grant guilty on both counts. The District Court sentenced Grant to 100 years on the first count plus 10 years for use of a weapon and 40 years on the

4

second count plus 10 years for use of a weapon, with the terms to run consecutively.

Following sentencing on February 9, 1983, Grant filed a notice of appeal through new counsel, Charles F. Moses. Shortly thereafter, the State filed criminal charges against Grant's trial counsel, K. M. Bridenstine, for tampering with evidence in Grant's case because, when handling the murder weapon prior to trial, Bridenstine may have intentionally have obscured fingerprint evidence. Bridenstine also hired Moses to represent him on the charge of tampering with evidence. The State objected to this on the grounds that it represented a conflict of interest for Moses. This Court issued an order disqualifying Moses from representing either client.

On July 10, 1985, at the request of this Court, Judge Thomas Olson held an evidentiary hearing concerning the pretrial responsibilities of the prosecutor, the District Court and Grant's counsel to inform Grant of the alleged improprieties of Grant's counsel. After hearing testimony, including that of the District Court Judge, Judge Olson concluded that Bridenstine did not impair himself from defending Grant during trial; Bridenstine acted competently during trial; no conflict of interest affected his performance as defense counsel; Grant received effective assistance of counsel and was not denied due process; the evidence did not show a reasonable likelihood that the jury verdict would have been different absent Bridenstine's misconduct; and the District Court and the county attorney had no affirmative duty to advise Grant of the possible charges against Bridenstine because they did not contemplate the charges and because Bridenstine's conduct at trial did

5

not appear impaired or ineffective. After the entry of the order in the above hearing, this Court heard the appeal.

We address ten issues:

(1)  Should Grant's convictions be reversed because an alternate juror was present in the jury room for a brief period of time after the case was submitted to the jury?

(2)  Did Grant receive effective assistance of counsel where he was not informed that his counsel mishandled the murder weapon?

(3)  Did the District Court properly refuse to give instructions on mitigated deliberate homicide, a lesser included offense of deliberate homicide?

(4)  Did the District Court correctly find the chain of custody adequate for the State's exhibits of bullets, cartridges, and a rifle introduced as the murder weapon?

(5)  Did the District Court correctly deny Grant's motion for a mistrial following a comment by the prosecutor that an armed deputy was "in charge and keeping the defendant?"

(6)  Did the amended information properly charge an offense in the language of the statute describing the offense?

(7)  Was Grant's false exculpatory statement properly admitted into evidence?

(8)  Were photographs of the victim's body properly admitted into evidence?

(9)  Was the murder weapon improperly seized by law enforcement officers?

(10)  Did the overall demeanor of the prosecution and the District Court, along with other errors, deprive Grant of a fair trial?

In the first issue Grant contends that the return of the alternate juror to the jury room with the jury after the case had been submitted for decision constitutes reversible error. The judge questioned the jury on the effect of the alternate's presence prior to asking for the verdict and, at a subsequent evidentiary hearing, heard testimony from the twelve jurors individually, the alternate juror and the bailiff. The questioning and testimony indicated that no one on the jury discussed the case with the alternate; that the alternate made no verbal or non-verbal expressions which conveyed his attitude about the case; that the alternate was present in the jury room from three to no more than fifteen minutes; that his presence after the submission of the case did not influence the decision of any juror; that the alternate went to dinner with the other jurors as he had done during trial; and that, pursuant to instructions, no one discussed the case over dinner. One juror indicated the foreman may have been selected when the alternate was in the jury room. After the questioning of the jury which occurred prior to their giving the verdict, the judge asked counsel if they had questions about the alternate's presence with the jury. Defense counsel stated "seems to be all right, your Honor." His first objection came twenty-seven days later when he filed a motion for a new trial.

Grant alleges that allowing the alternate into the jury room violates § 46-16-501, MCA, which requires an officer of the court to prevent outside communication with the jurors during trial and § 46-16-503(1), MCA, which requires an officer of the court "to keep the jurors together and to prevent conversations between the jurors and others" after the jury retires. Since the questioned conduct occurred

7

after the case was submitted to the jury, we will consider § 46-16-503(1), MCA, rather than § 46-16-501, MCA. We find no violation of § 46-16-503(1), MCA. An alternate, although excluded from deliberating and voting, is in every other respect a juror. The alternate is accepted after voir dire, sits with the jurors through oral argument, and is governed by the admonitions of the district court. The alternate is not discharged until after the verdict. Section 46-16-307, MCA. As such, an alternate would not fall within the statutory ban against conversations with others.

Section 46-16-307(3), MCA, requires discussion as well. It states:

> . . . [A]n alternate juror may not join the jury in its deliberation unless called upon by the court to replace a member of the jury. His conduct during the period in which the jury is considering its verdict shall be regulated by instructions of the trial court. An alternate juror who does not replace a principal juror shall be discharged after the jury arrives at its verdict.

In State Highway Commission v. Dunks (1975), 166 Mont. 239, 531 P.2d 1316, the alternate juror went into the jury room when the jury began its deliberations. No one established how long she was in the jury room or what went on while she was present. The jury foreman submitted an affidavit stating the alternate sat in for a few minutes, she did not participate in discussion or deliberation, and her presence did not prejudice or "seriously [cause] injustice to the defendants." Dunks, 166 Mont. at 241, 531 P.2d at 1317. Apparently, she may have been present during some deliberations. This Court observed that the jury foreman's opinion should not be the deciding factor because he did not know what prejudicial effect her presence had on the other

8

jurors and that the evidence conflicted on how much time the alternate spent in the jury room. This Court then held that the District Court properly granted a new trial. Dunks, 166 Mont. at 244, 531 P.2d at 1318.

Grant asserts that Dunks controls here. However, Dunks is distinguishable from this case in the following respects: (1) In Dunks, no one established how long the alternate was present in the jury room. Here, jury testimony established the alternate's presence for "a few minutes," or 3 to 15 minutes maximum. (2) In Dunks, the alternate may have been present during some deliberations. Here, the alternate was not present during deliberations. (3) In Dunks, only the foreman submitted an affidavit on the alternate's role. No one testified on what was said in the jury room or what effect any communication had. Here, all twelve jurors and the alternate testified under oath that no deliberations began while the alternate was present, no one discussed the case with the alternate either in the jury room or at dinner, he did not take part in any deliberations, and the jurors were not influenced by the alternate's brief presence in the jury room. In addition, in Dunks there was little evidence on which the District Court could rely for its decision. Here, the District Court held a full evidentiary hearing on the matter prior to denying Grant's motion for a new trial. This Court summarized the general rule on jury misconduct in State v. Eagan (1978), 178 Mont. 67, 79, 582 P.2d 1195, 1202:

> . . . [I]f jury misconduct is shown tending to injure the defendant, prejudice to the defendant is presumed; however, the presumption is not absolute and may be rebutted by the use of testimony of the jurors to show facts which prove that prejudice or injury did not or could not occur . . . [Citations omitted.]

In this case, unlike Dunks, the State produced juror testimony on which the District Court could properly rely to find no prejudice or injury to Grant occurred. We hold that since no deliberations had begun, the State showed no prejudice or injury to Grant. Thus, no reversible error occurred.

In the second issue, Grant asserts that he did not receive effective assistance of counsel where his retained trial counsel mishandled the murder weapon and neither his counsel, the District Court nor the prosecutor informed him of the possible charges against his counsel which could have resulted in a conflict of interest between Grant and Bridenstine. The State submits that this Court should defer to the findings and conclusions made by Judge Olson following the evidentiary hearing on this issue.

The defendant carries a heavy burden in Montana to establish a claim of ineffective assistance of counsel. State v. Henricks (Mont. 1983), 672 P.2d 20, 25, 40 St.Rep. 1786, 1790. He must show that counsel failed to act within the range of competence resulting in prejudice to his defense or rights. Henricks, supra. Thus, to prevail on this claim, Grant must show prejudice, i.e., "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington (1984), 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698, reh. den. (1984), ___ U.S. ___, 104 S.Ct. 3562, 82 L.Ed.2d 864.

The record and the findings made after the evidentiary hearing may demonstrate improper action on Bridenstine's part, but they do not demonstrate a conflict of interest at the time of trial. The prosecutor, although upset about the

10

incident, did not initially plan to file charges against Bridenstine. The matter was referred to the Attorney General's office for investigation only after the discovery of additional evidence. Bridenstine was not aware criminal charges would be filed. No witness at the evidentiary hearing, including the District Court Judge who presided at the trial and Charles F. Moses who briefly represented both Grant and Bridenstine, could refer to any act or omission at trial which would constitute ineffectiv* assistance. Given Bridenstine's performance at trial, his testimony at the evidentiary hearing that he was not aware of any impending charges, the prosecutor's decision to not press charges but only refer the matter for investigation and the lack of charges until the trial was completed, we find no conflict of interest existed which hampered Bridenstine's effectiveness at trial.

In addition, Grant has not demonstrated that any alleged conflict of interest or ineffective representation resulted in prejudice to his rights or defenses. Judge Olson correctly pointed out that the evidence presented at the hearing "does not establish that the jury verdict reached in [this] case would reasonably likely have been different absent the misconduct of defense counsel," citing Strickland, supra. Any of Grant's fingerprints on the murder weapon, potentially obscured by Bridenstine's actions, were not critical at trial because several other people, including a witness and deputies, handled the rifle. Bridenstine showed no reticence when cross-examining the State's witness about fingerprint evidence and the District Court Judge testified that Bridenstine performed as an agressive, competent lawyer.

11

Grant has failed to demonstrate prejudice from any misconduct by Bridenstine.

Grant also maintains that the failure to inform him of possible charges against Bridenstine deprived him of his right to counsel. The prosecutor did not complete any investigation into the incident and was not aware of the charges prior to trial. Under these circumstances, neither the District Court nor the prosecutor could have an affirmative duty to advise Grant of the charges. Similarly, Bridenstine was unaware of the charges and could not have informed Grant. Finally, Grant and possibly one of his parents, were present at an omnibus hearing in September 1982 when the matter was called to the attention of the District Court Judge. We hold that Grant was not denied effective assistance of counsel due to either any misconduct of defense counsel or any failure to inform him of the possible charges prior to the completion of trial.

The third issue concerns whether the District Court properly refused to give instructions on mitigated deliberate homicide, a lesser included offense of deliberate homicide. ". . . [T]he district court's instructions must cover every issue or theory having support in the evidence, and the inquiry of the district court must only be whether or not any evidence exists in the record to warrant an instruction on mitigated deliberate homicide." (Emphasis in original.) State v. Buckley (1976), 171 Mont. 238, 242, 557 P.2d 283, 285.

Deliberate homicide is mitigated when it is committed under the influence of extreme mental or emotional stress for which there is a reasonable explanation or excuse. Section 45-5-103(1), MCA.

12

The only potentially mitigating circumstance presented at trial concerned Grant's use of alcohol on the night in question. Voluntary intoxication, alone, is insufficient to show "extreme mental or emotional stress" which would reduce a charge of deliberate homicide to mitigated deliberate homicide. State v. White (Mont. 1981), 632 P.2d 1118, 1121-22, 38 St.Rep. 1417, 1422. In White, the defendant attempted to withdraw his plea of guilty to deliberate homicide asserting that he did not adequately understand the charge. Apparently, he argued that his voluntary use of alcohol and drugs at the time of the homicide may have been circumstances which would have allowed a jury to find him guilty of the lesser charge of mitigated deliberate homicide. This Court affirmed the District Court's denial of the defendant's motion to withdraw his plea and noted no evidence of emotional stress. State v. Azure (1977), 175 Mont. 189, 573 P.2d 179, was distinguished in that the defendant in Azure, "in addition to being under the influence of drugs and alcohol at the time he committed the crime, was said to have been emotionally depressed." White, 632 P.2d at 1122, 38 St.Rep. at 1422. The evidence presented at this trial does not show Grant was under the influence of emotional stress. One witness described Grant as in a "good mood." There were references to his having beer cans in his car and his having been in a bar. This evidence shows at most the possibility of the influence of alcohol. It does not show emotional stress which would warrant an instruction on mitigated deliberate homicide.

Grant was not entitled to instructions on mitigated deliberate homicide for a second reason--his main defense at trial was alibi. In State v. Baugh (1977), 174 Mont. 456,

571 P.2d 779, the defendant was convicted of deliberate homicide. His theory at trial was that he did not kill the victim and had no knowledge of who did. This Court held that the District Court judge properly refused to instruct the jury on mitigated deliberate homicide:

> In the instant case there was no evidence in the record to show mitigation as required by section [45-5-103]. In fact, defendant's theory throughout the trial was that he did not murder the victim. In State v. McDonald, 51 Mont. 1, 16, 149 P. 279, 285 (1915), it was said:
>
> ". . . In many instances, however, the evidence is such as to show that the defendant is either guilty of the offense charged or is entitled to an acquittal. In such cases the court may not be put in error for refusing or failing to instruct as to the lower degree or the included offense."

Baugh, 174 Mont. at 460, 571 P.2d at 781.

Grant claims that Baugh is distinguishable because there the defendant testified that he did not kill the victim and did not know who did, whereas here, Grant did not testify and did not tell his story to the jury. This distinction is meaningless. The defendant in State v. Radi (1978), 176 Mont. 451, 463-64, 578 P.2d 1169, 1177, presented his alibi defense through his witnesses. There, this Court remarked that the nature of the alibi defense was not consistent with presenting the lesser included offense and held that the jury heard no evidence from which it could rationally conclude the defendant was guilty only of the lesser included offense. Similarly here, Grant presented his alibi defense through his aunt. She testified that Grant and Jones were in the Tepee Village Cafe with her when she heard some shots fired. If the jury had believed this testimony, it would have been inconsistent with finding Grant guilty of mitigated

14

deliberate homicide. As in McDonald, and Baugh, supra, the evidence shows that Grant is either guilty of the offense charged or entitled to an acquittal. We find no error in the District Court's refusal to instruct on the lesser included offense of mitigated deliberate homicide.

The fourth issue involves whether three exhibits, the bullets taken from the body, the four cartridges found at the scene, and the murder weapon, were admitted into evidence without the State establishing a proper chain of evidence. The basic rules which govern the chain of evidence are set forth in State v. Wells (1983), 202 Mont. 337, 356, 658 P.2d 381, 391:

> It is not necessary for the State to prove that it would be impossible to tamper with the exhibits . . . Rather, the State need only make a prima facie showing that there has been no substantial change in the evidence . . . After such a showing, the burden of proof shifts to the defendant to show why the evidence should not be admitted . . . Adequacy of the foundation for the admission of evidence is within the discretion of the District Court and its determination of adequacy will not be overturned absent a clear abuse of discretion. [Citations omitted.] [Emphasis in original.]

Each exhibit was properly admitted. With respect to the bullets, the pathologist testified that he removed the bullets from the body and clothing of Jay Mitchell Witteman, placed them in a plastic bottle and gave them to an undersheriff of Lake County. The undersheriff marked the container, put it in an evidence bag, and locked it up in his office. The State firearms and toolmark examiner testified that he received the bullets from the undersheriff for testing at the crime lab. He initialed the evidence bag and, after he had completed testing, the undersheriff picked up

15

this evidence bag from the crime lab. The undersheriff brought it back to his office where he locked it in a file cabinet. The examiner and the undersheriff both identified this piece of evidence in court. The State established a similar chain of custody for the cartridges found at the scene. Grant's only complaint about the rifle introduced into evidence related to a letter which contained an incorrect digit in the serial number. The undersheriff testified that the laboratory reports contained the correct serial number and the incorrect digit in the letter apparently was a clerical error.

Extensive testimony chronicled the labeling, storing, securing, transferring of possession and testing of each exhibit. The State made a prima facie showing that there had been no substantial change in the evidence. Grant produced no evidence to show actual or even potential tampering could have occurred. Even if this Court accepted Grant's argument that the State inadequately identified the evidence, such a defect would go to the weight rather than the admissibility of the evidence. State v. Zuidema (1971), 157 Mont. 367, 372, 485 P.2d 952, 955. At trial, he vigorously attacked the chain of evidence and argued that the State inadequately marked and identified the evidence. Thus, the jury had an opportunity to weigh this evidence. We hold that the District Court did not abuse its discretion when admitting these items into evidence.

In the fifth issue, Grant contends that the prosecutor's statement before the jury that an armed deputy was "in charge and keeping the defendant" warrants a new trial. During cross-examination, defense counsel drew the jury's attention to the fact that the officer guarding the

16

defendant was armed in order to demonstrate that the witness had limited powers of observation. A short time later, the prosecutor made the statement which Grant complains prejudiced him before the jury and which he claims should have been the subject of a cautionary instruction. Obviously, defense counsel drew the jury's attention to the armed officer. Further, if he thought a cautionary instruction was necessary, he should have offered one. State v. Close (Mont. 1981), 623 P.2d 940, 947, 38 St.Rep. 177, 186. The District Court properly cautioned both counsel and ended the matter. The defendant has failed to show any error which affected his substantial rights or resulted in prejudice. We hold that the District Court did not abuse its discretion when it failed to declare a mistrial.

Grant claims in the sixth issue that the amended information failed to state an offense by not adequately alleging the proper mental state and that therefore the attempted deliberate homicide conviction should be reversed and the amended information dismissed. The portion of the amended information at issue stated:

> That on or about July 17, 1982 in Lake County, Montana the defendant, DONALD DEAN GRANT, performed an act toward the commission of the crime of DELIBERATE HOMICIDE, a Felony, of KARL WARBITSKY with the purpose to commit that offense by shooting repeatedly with a rifle into a certain two-person campers [sic] tent in which the said KARL WARBITSKY and his companion, JAY MITCHELL WITTEMAN, were sleeping.

An information is sufficient if it properly charges an offense in the language of the statute describing the offense, State ex rel. Glantz v. District Court (1969), 154 Mont. 132, 142, 461 P.2d 193, 198-199, and if it adequately apprises the accused of the crime charged. It need not be

perfect. State v. Coleman (1978), 177 Mont. 1, 22, 579 P.2d 732, 745. The test of sufficiency is often expressed as whether a person of common understanding would know what is intended to be charged. State v. Dunn (1970), 155 Mont. 319, 327, 472 P.2d 288, 294. Section 45-4-103(1), MCA, defines the offense charged as follows: "A person commits the offense of attempt when, with the purpose to commit a specific offense [deliberate homicide here], he does any act toward the commission of such offense." The information charged attempted deliberate homicide using the language of this statute. It apprised Grant of the crime charged using language with which a person of common understanding would know what is intended to be charged. We hold that the information properly stated an offense.

As part of this issue, Grant argues that the instructions compounded the defect in the information. The instructions to the jury correctly reflected the law applicable to the crime charged and, as we held above, no defect existed in the information. Thus, we find this argument unpersuasive.

In the seventh issue, Grant claims that a voluntary statement he gave to a deputy sheriff prior to the time he was a suspect in the homicide should not have been admitted. Grant reported to authorities that his car had been stolen when he returned to the gravel pit after the homicide had been discovered. When a deputy sheriff later questioned him about the theft, Grant gave a statement about his actions and whereabouts at the time of the homicide that later proved to be false. Since he was not a suspect at the time, the deputy sheriff did not give Grant the Miranda warnings. A false exculpatory statement may be used as evidence of

18

"consciousness of guilt and unlawful intent." State v. Goltz (1982), 197 Mont. 361, 369, 642 P.2d 1079, 1083-84. Grant apparently argues that since the statement was not made regarding the particular crime charged, as in Goltz, supra, it no longer shows "consciousness of guilt and unlawful intent." We find no merit in this distinction. The suspicious circumstances about which Grant gave a false explanation tended to connect him to the homicide regardless of the reason for the statement. We hold that the statement was properly admitted into evidence.

The eighth issue concerns the admission of photographs of the victim taken at the scene of the crime. In this case, the District Court admitted the photographs into evidence after defense counsel raised issues relating to the locations of the bullet holes in the tent and sleeping bag, the position of the victim's body in the tent, and the locations of wounds on the body. "The longstanding rule in Montana is that a photograph is admissible if it 'fairly and accurately represents relevant evidence.' State v. Jones (1914), 48 Mont. 505, 139 P. 441. It is within the discretion of the trial court to allow into evidence duly verified photographs to aid the jury in its fact-finding process . . ." (Citations omitted.) State v. Mackie (Mont. 1981), 622 P.2d 673, 674, 38 St.Rep. 86, 88. Once relevance is established, photographs should not be excluded only because of potential prejudice. State v. Austad (1982), 197 Mont. 70, 83, 641 P.2d 1373, 1380. The photographs in this case were relevant to the dispute on how the wounds were inflicted and the victim's position when the shots were fired and aided the jury in its fact-finding on these questions. The District Court correctly determined their probative value outweighed

19

any prejudice to Grant. We hold that the photographs were properly admitted into evidence.

Grant asserts, in the ninth issue, that the rifle used in the homicide "was taken by questionable means." He expresses no specific legal defect in the seizure of the weapon and acknowledges that he made no suppression motion prior to trial. This issue may not be raised for the first time on appeal. State v. Gallagher (1973), 162 Mont. 155, 167-68, 509 P.2d 852, 859. Therefore, we will not address this issue further.

In the final issue, Grant argues that the overall demeanor of the prosecution and the District Court, together with the other alleged errors set forth above, requires a reversal of his conviction. He articulates no particular comments or remarks and alleges no prejudice to his substantial rights. Montana acknowledges the "cumulative error doctrine." This refers to the accumulation of errors which prejudice a defendant's right to a fair trial. State v. McKenzie (1978), 177 Mont. 280, 581 P.2d 1205. Mere allegations of error without proof of prejudice are insufficient to satisfy the cumulative error doctrine. State v. Phelps (Mont. 1985), 696 P.2d 447, 454, 42 St.Rep. 305, 313. The resolutions of the prior issues indicate no error meriting reversal. Grant's allegations in raising this issue are vague and without support in the record. We hold that Grant has failed to carry his burden of showing prejudice and decline to reverse his conviction on this ground.

Grant's convictions are affirmed.

We Concur:

_L. A. Turnage_
Chief Justice

_John Conway Harrison_

_John C. Sherry_

_William E. Hunt Sr._
Justices

21