No. 90-017

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

STATE OF MONTANA,

       Plaintiff and Respondent,

  -vs-

OWEN TODD EVANS,

       Defendant and Appellant.

FILED

FEB 14 1991

Ed Smith

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:  District Court of the Eighteenth Judicial District,
In and for the County of Gallatin,
The Honorable Thomas A. Olson, Judge presiding.


COUNSEL OF RECORD:

      For Appellant:

          Edward G. Beaudette; Knight, Dahood, McLean and
Everett, Anaconda, Montana

      For Respondent:

          Hon. Marc Racicot, Attorney General, Helena, Montana
Elizabeth L. Griffing, Assistant Attorney General,
Helena, Montana
A. Michael Salvagni, County Attorney, Bozeman,
Montana
Marty Lambert, Deputy County Attorney, Bozeman,
Montana


Submitted on Briefs:  October 19, 1990

Decided:  February 14, 1991

Filed:

_____
        Clerk

Justice Diane G. Barz delivered the Opinion of the Court.

Owen Todd Evans appeals from his September 28, 1989, conviction of aggravated burglary, two counts of felony assault, and one count of felony theft by a jury sitting in the District Court of the Eighteenth Judicial District, Gallatin County. We affirm.

Evans presents the following issues:

1. Did the jury improperly find a "stun-gun" to be a weapon for purposes of aggravated burglary and felony assault?

2. Did the District Court err in failing to instruct the jury on the definition of a weapon under Montana law and on the lesser included offense of assault?

3. Was Evans subjected to double jeopardy by being convicted for both aggravated burglary and felony assault?

4. Did the District Court err in failing to exclude from evidence the contents of Evans' gym bag when it was shown to contain items not listed on the original inventory when the bag was seized?

5. Did the District Court err in allowing the testimony of William Kayser as an expert in the field of handwriting analysis and questioned document examination?

6. Was the sentence imposed by the District Court improper due to its scope and severity?

7. Did the District Court properly exclude Evans' parents, who were potential witnesses, from the courtroom?

On the night of March 2, 1989, Holly Engdahl, a student at

Montana State University, was awakened in her bedroom by a man wearing a ski mask and gloves. The attacker told Engdahl to "shut up" and jabbed Holly repeatedly with a device later identified as a "stun gun," leaving burns on Engdahl's body. Engdahl also suffered bruises and a bloody nose in the attack.

The two struggled, and Engdahl broke free and ran to the basement of her condominium, where she tried the telephone, which was inoperable, and hid for a few minutes. When all was quiet, Engdahl came out of her hiding place. She then heard a noise and went to the gun cabinet. As Engdahl unlocked the gun cabinet, a bullet was fired from upstairs through the floor, striking the gun cabinet and the light switch. Engdahl grabbed a rifle from the gun cabinet and heard the front door shut. Carrying the rifle, she ran in her nightshirt and bare feet through snow to a neighbor's residence for help.

Engdahl thought that her assailant's voice sounded similar to that of a neighbor, Owen Evans, whom she had known for a number of years. Evans had sent Engdahl flowers and asked her for dates, which she refused after going out with him twice. Police searched Evans' condominium, one door down from Engdahl's residence. They seized several items demonstrating Evans' obsession with Engdahl, including a calendar noting when various people had come to her condominium. Police also seized a cassette tape of recorded phone conversations between Engdahl and other people and later discovered that Evans had tapped Engdahl's phone.

The police additionally seized a slide and barrel mechanism

3

for a .45 caliber handgun, a box of instructions for a Defender Pro 40 stun gun, and battery chargers with a 9-volt rechargeable battery, the size necessary to operate the stun gun. Police also took a wallet containing forms of identification belonging to the defendant, cash, and credit cards.

When the police searched Evans' pickup truck, they discovered two loaded .45 caliber magazines and numerous rounds of .45 caliber ammunition.

On March 4, 1990, the police issued a warrant for Evans' arrest, and the next day his truck disappeared. One of Evans' credit card companies, contacted by police, notified them that Evans had used a credit card in Pocatello, Idaho. Pocatello police apprehended Evans who consented to a search of his truck. Police seized a gym bag containing 30 items, including a .45 caliber pistol frame and a Defender Pro 40 model stun gun. Evans later moved for suppression of the evidence contained in the gym bag on the ground that two items in the bag, two tubes of lubricant, were omitted in the inventory of its contents.

Police were able to piece together where Evans had hidden from the time of the attack until he left in his truck. Distinctive footprints led from Engdahl's condominium to condominium No. 34 owned by a woman who lived out of town. Engdahl's fingerprints were found on a light bulb and telephone in the condominium. Some items missing from condominium 34 were later found in Evans' possession. The police also seized a Ruger .44 caliber pistol taken from the gun case in Engdahl's condominium, a slide and

4

barrel mechanism for a .45 caliber handgun, a black knit ski mask, and a pair of tennis shoes.

The cartridge casing taken from Engdahl's condominium matched the .45 receiver taken from Evans' truck in Pocatello and the barrel and slide found in condominium 34. The hairs found on the ski mask were substantially similar to those taken from Evans' head. The tennis shoes matched the prints in the snow leading from Engdahl's condominium to condominium 34.

The morning after the attack, Engdahl's automobile was discovered missing. Her car was later found in the garage for condominium 34. Plastic garbage bags had been stapled over the garage windows. Staples used to secure the garbage bags matched fired staples from a staple gun seized from Evans' condominium.

Evans presented no evidence at trial. He was found guilty of all four offenses with which he was charged. During the sentencing hearing, an expert testified that Evans was not suffering from amnesia as he had claimed, that he had a preoccupation with weaponry and methods of restraint, and that he showed indications that he was a sexual psychopath or sexual sadist.

The District Court imposed the following prison sentence on Evans:

1. Aggravated burglary: 40 years with an additional 10 years for use of a weapon, the stun gun.

2. Felony assault: 10 years with 10 additional years for use of the stun gun to be served concurrently with the above sentence.

3. Felony assault: 10 years with 10 additional years for

5

firing a gun, to be served consecutively to the sentence imposed for counts one and two.

4. Felony theft: 10 years to be served consecutively to the sentences for counts one, two, and three.

The District Court designated Evans as a sexual offender to receive sexual offender treatment in Montana State Prison and ordered that Evans not be released for parole until he had satisfactorily completed such treatment. The court also declared Evans ineligible for parole for 25 years.

I

Did the jury improperly find a "stun-gun" to be a weapon for purposes of aggravated burglary and felony assault?

Owen Evans was convicted of one count of felony assault arising from the attack upon Holly Engdahl with an electric stun gun. The difference between misdemeanor assault and felony assault is whether a weapon is used to cause bodily harm:

> (2) A person commits the offense of felony assault if he purposely or knowingly causes:
>
> (a) bodily injury to another with a weapon;
>
> (b) reasonable apprehension of serious bodily injury in another by use of a weapon; or
>
> (c) bodily injury to a peace officer or a person who is responsible for the care or custody of a prisoner.

Section 45-5-202(2), MCA. A "weapon" is "any instrument, article, or substance which, regardless of its primary function, is readily capable of being used to produce death or serious bodily injury." Section 45-2-101(71), MCA. In turn, "serious bodily injury" is

6

defined as follows:

> "Serious bodily injury" means bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement or protracted loss or impairment of the function or process of any bodily member or organ. It includes serious mental illness or impairment.

Section 45-2-101(59), MCA. Evans claims that the State did not show that a stun gun meets the statutory requirements of §§ 45-2-101(71) and (59), MCA, by demonstrating that a stun gun is capable of causing death, "substantial risk of death," or "protracted loss or impairment of the function or process of any bodily member or organ."

The test for sufficiency of the evidence with respect to a factual element of a crime is whether any rational trier of fact could have found that element beyond a reasonable doubt. State v. Earl (Mont. 1990), 790 P.2d 464, 465, 47 St.Rep. 351, 353. The weapon produced burns on Engdahl's body, and Engdahl testified that she was burned by "some sort of device that every time it touched me, it set off sparks. And it would drain me. I'd feel real drained after I got hit with it." Further, the stun gun instructions admitted into evidence stated:

> A short blast of 1/4 second duration will startle an attacker, cause minor muscle contractions and have a repelling effect.

> A moderate length blast of 1 to 4 seconds can cause an attacker to fall to the ground and result in some mental confusion. It may make an assailant unwilling to continue an attack, but he will be able to get up almost immediately.

> A full charge of 5 seconds can immobilize an attacker, cause disorientation, loss of balance, falling to the ground and leave them weak and dazed for some minutes

7

afterward.

> NOTE: Any blast lasting over 1 second is likely to cause your assailant to fall. If you do not help them down, gravity may injure them.

The instructions show that a stun gun is capable of immobilizing a person and could seriously injure a person who falls after being shocked by the gun.

Previously, instruments potentially less harmful than a stun gun have been found to be weapons. We have upheld the jury's finding that an ashtray is a weapon. State v. Klemann (Mont. 1981), 634 P.2d 632. A pair of panty hose qualified as a weapon in State v. Howard (1981), 195 Mont. 400, 637 P.2d 15. In State v. Matson (1987), 227 Mont. 36, 736 P.2d 971, a pellet gun was said to be a weapon.

Statutes in Illinois, Michigan, North Carolina, North Dakota, and the City of New York describe stun guns as weapons. See Ill. Rev. Stat. ch. 38, para. 24-1 (1985); Mich. Comp. Laws § 750.224(a) (Supp. 1990); N.C. Gen. Stat. § 14-269(a) (1990); N.D. Cent. Code § 62.1-01-01(1) (1985); New York City Adm. Code § 10-135(a)-(d). The New York City Council made it an offense to possess or sell a stun gun because stun guns "'may be used by criminals to subdue and disable their victims while engaged in the commission of crimes against them.'" People v. Lynch (N.Y. City Crim. Ct. 1989), 546 N.Y.S.2d 538, 539 (quoting Local Laws 1985, No. 38, Section 1).

Recently, the Ninth Circuit Court of Appeals upheld a conviction of boarding an airplane while concealing a dangerous weapon where the defendant had a concealed stun gun. U.S. v.

8

Wallace (9th Cir. 1986), 800 F.2d 1509, cert. denied, 481 U.S. 1019, 107 S.Ct. 1901, 95 L.Ed.2d 507. According to federal caselaw, a dangerous weapon is an instrument which is capable of producing death or great bodily harm, a definition similar to the Montana definition of a weapon. See United States v. Dishman (9th Cir. 1973), 486 F.2d 727, 730. Rejecting the defendant's argument that a stun gun merely incapacitates its victims temporarily and cannot inflict serious permanent harm, the court noted that a single stun gun could incapacitate twenty to forty people at a time and could cause permanent injury to the eyes. Wallace, 800 F.2d at 1513. In Matson the rationale for finding a pellet gun to be a weapon was that "a high-velocity pellet in the eye is certainly capable of inflicting 'serious bodily injury.'" Matson, 227 Mont. at 40-41, 736 P.2d at 974.

The jury's finding that a stun gun is a weapon is consistent with federal caselaw, statutes of other states, and Montana law and is supported by the evidence. We hold that the evidence is sufficient for the trier of fact to deduce that a stun gun is a weapon capable of producing serious bodily injury as defined by §§ 45-2-101(71) and (59), MCA.

II

Did the District Court err in failing to instruct the jury on the definition of a weapon under Montana law and on the lesser included offense of assault?

Evans claims that the District Court failed to instruct the

jury on the definition of a weapon, which in turn meant that the jury should have been instructed on simple assault, as well as aggravated assault.

Since Evans failed to object to the instruction at trial, he is now precluded from raising the issue on review. Section 46-20-104(2), MCA, provides that "[f]ailure to make a timely objection during trial constitutes a waiver of the objection except as provided in 46-20-701(2)." Since § 46-20-701(2), MCA, does not apply, Evans may not challenge this instruction on appeal. State v. Smith (1984), 208 Mont. 66, 71-74, 676 P.2d 185, 188-190.

In addition, Evans failed to offer an instruction that misdemeanor assault is a lesser included offense of burglary. Error may not be predicated upon the failure to give an instruction when the party alleging the error failed to offer the instruction. State v. Smith (1987), 228 Mont. 258, 265, 742 P.2d 451, 455. We decline to consider this issue because it is not properly before the Court.


III

Was Evans subjected to double jeopardy by being convicted for both aggravated burglary and felony assault?

Evans claims that since a stun gun is not a weapon, he was subjected to double jeopardy by being punished twice for the same misdemeanor assault arising from the use of the stun gun and also by having two sentencing enhancements for use of a weapon.

Since we have held that the evidence was sufficient for the

10

jury to conclude that the stun gun was a weapon, Evans' argument is moot.

In addition, Evans asserts that the District Court erred in imposing sentences for both aggravated burglary and felony assault. Aggravated burglary and felony assault are two distinct offenses requiring proof of several different elements. One can commit aggravated burglary without perpetrating aggravated assault, and one can carry out aggravated burglary without performing aggravated assault. State v. Wells (1983), 202 Mont. 337, 352, 658 P.2d 381, 389. As explained in Wells:

> The legislature unmistakably intended multiple punishments for the offenses of aggravated burglary and aggravated assault. If a person enters or remains unlawfully in an occupied structure with the intent to commit an aggravated assault, he has committed a burglary. If he then commits the aggravated assault, he may be convicted of it and sentenced for it in addition to conviction and sentencing for the burglary.

Wells, 202 Mont. at 354, 658 P.2d at 390. Evans' conviction of both crimes did not constitute double jeopardy.


IV

Did the District Court err in failing to exclude from evidence the contents of Evans' gym bag when it was shown to contain items not listed on the original inventory when the bag was seized?

Evans asserts that the omission of two items from the inventory of the contents of the gym bag demonstrated a substantial change of the evidence warranting that the gym bag and its contents be excluded from evidence. Since the bag contained a stun gun, the evidence was critical to the charges against Evans.

11

Determination of whether a proper foundation has been laid for the introduction of exhibits into evidence rests with the trial court and its determination will not be overturned on appeal absent clear abuse of discretion. State v. Fox (1984), 212 Mont. 488, 491, 689 P.2d 252, 254. To support proper identification and foundation, the prosecution must show that the exhibit is connected with the crime and identified as such. McGuinn v. State (1978), 177 Mont. 215, 221, 581 P.2d 417, 421.

Montana recognizes two methods of identifying physical evidence: ready identification and chain of custody. When the evidence has a unique characteristic that makes it readily identifiable, chain of custody need not be shown. State v. Conrad (Mont. 1990), 785 P.2d 185, 189, 47 St.Rep. 32, 37. Here, the chain of custody method was appropriate. The burden is on defendant to show any tampering prior to acquisition of the evidence. State v. Walton (1986), 222 Mont. 340, 343, 722 P.2d 1145, 1147. The burden is on the prosecution to demonstrate that after the State acquired the evidence, no substantial change in the evidence occurred and that the evidence was in the State's continuous possession. Conrad, 785 P.2d at 189, 47 St.Rep. at 37.

The exhibit was identified as the same bag that was seized from Evans' truck. The officer testified that the bag was in the same condition as when it was seized and established its chain of custody. Two items out of thirty in the bag were omitted from the inventory due to a clerical error.

A defect or deficiency with respect to proper identification,

such as a clerical error, goes to the weight of evidence and not its admissibility. State v. Grant (1986), 221 Mont. 122, 134, 717 P.2d 562, 570. As in Grant, the defendant challenged the chain of evidence in front of the jury, and the jury had the opportunity to weigh the evidence. Further, no evidence exists of any change in the items in the bag or tampering with the evidence. We hold that the District Court did not abuse its discretion in admitting the bag and its contents.

V

Did the District Court err in allowing the testimony of William Kayser as an expert in the field of handwriting analysis and questioned document examination?

Evans maintains that Kayser should not have been qualified as an expert pursuant to Rule 702, M.R.Evid., because his training and experience as an expert in handwriting analysis and questioned document examination were inadequate.

Under Rule 702, M.R.Evid., a witness may be qualified as an expert by knowledge, skill, experience, training, or education. The determination that a witness is an expert is largely within the discretion of the trial judge, and such determination will not be disturbed on appeal unless the court is shown to have abused its discretion. State v. Martin (1987), 226 Mont. 463, 736 P.2d 477. "The degree of a witness' qualifications affects the weight of the expert's testimony, not its admissibility." Martin, 226 Mont. at 466, 736 P.2d at 479.

13

William Kayser, a detective with the Bozeman Police Department, had taken a two-week questioned document course, had worked on approximately 20 criminal cases as a handwriting expert, and was spending approximately 25 percent of his time on the examination of questioned documents. Based on his experience and training, he gave a very complete examination of the documents in this case.

As we have previously stated, "[c]ross-examination is the shield to guard against unwarranted opinions." Stewart v. Casey (1979), 182 Mont. 185, 193, 595 P.2d 1176, 1180. In addition, the defense was free to offer testimony rebutting the detective's analysis, but did not do so. The District Court instructed the jury that the jury could give expert testimony whatever weight it deserved and could reject the testimony entirely, if in the jury's opinion the testimony was unsound. We hold that the District Court did not abuse its discretion by allowing Detective Kayser to testify as an expert.

VI

Was the sentence imposed by the District Court improper due to its scope and severity?

Evans contends that he should not have been charged with felony assault for use of the stun gun because a stun gun is not a weapon under Montana law. Since we have upheld the jury's treatment of a stun gun as a weapon, the charge of felony assault is appropriate, and the District Court did not err in enhancing

14

Evans' sentence for use of a weapon.

Evans also alleges that the District Court abused its discretion in denying eligibility for parole for twenty-five years and requiring sexual offender treatment.

Ineligibility for parole is governed by § 46-18-202(2), MCA:

> Whenever the district court imposes a sentence of imprisonment in the state prison for a term exceeding 1 year, the court may also impose the restriction that the defendant be ineligible for parole and participation in the supervised release program while serving his term. If such a restriction is to be imposed, the court shall state the reasons for it in writing. . . .

The District Court stated in its Reasons for Sentence:

> [The defendant] is deemed to be shrewd, self-serving, deceitful, extremely dangerous, a high risk for escape and for future crimes. The court also takes into account the testimony in this case which indicates a very thorough preparation for the crime on behalf of the defendant, an insidious invasion into the privacy of the victim, the tapping of her phone wires, the ordering of lingerie in her name deliverable to him, the careful analysis of the Montana Criminal Code to see what crimes he would be committing and what the consequences of those crimes would be, a very elaborate attempt to set up the crime and to cover his escape.

The District Court designated Evans as a "dangerous person," taking the defendant out of the category of "nondangerous offender" pursuant to § 46-18-404(1), MCA. We have previously held that a defendant need not have had a prior criminal record to "represent a substantial danger to other persons or society," as required by § 46-18-404(1), MCA. State v. Baldwin (1990), 242 Mont. 176, 184-86, 789 P.2d 1215, 1221-22. Similarly, we hold that the District Court set forth sufficient reasons for finding that Evans is not a nondangerous offender and for limiting his eligibility for parole

15

to 25 years pursuant to § 46-18-202(2), MCA.

In exacting additional sentencing restrictions, such as sexual offender treatment, the District Court must comply with §§ 46-18-201 and 202, MCA. Pursuant to § 46-18-201(1)(a)(x), MCA, reasonable restrictions may include "any . . . reasonable conditions considered necessary for rehabilitation or for the protection of society." Pursuant to § 46-18-202(1)(e), MCA, the court may impose any restriction or condition "reasonably related to the objectives of rehabilitation and the protection of society."

The sentencing condition must correlate with either the rehabilitation of the offender or the protection of society. State v. Black (Mont. 1990), 798 P.2d 530, 534, 47 St.Rep. 1677, 1682. In Black the District Court found the court's additional sentencing condition of sexual offender treatment reasonable since the record supported the sexual nature of the assault conviction and the defendant's need for sexual offender treatment. Black, 798 P.2d at 534-35.

The record reveals Evans' obsession with the victim and suggests a sexual motive for the assault. In addition, during the sentencing hearing, a psychologist testified that Evans could be a "sexual psychopath" or "sexual sadist" and recommended that he be fully evaluated by an expert in this field. We hold that the District Court did not err in imposing the condition of sexual offender treatment as part of Evans' sentence since it correlates with Evans' need for rehabilitation.

16

Evans also alleges that the District Court abused its discretion in imposing the maximum sentence on each count and enhancing the sentence for use of a weapon. To the extent that Evans is disputing the severity of the sentence, he must seek relief from the Sentence Review Division. As we have long held, "'[w]e will not review a sentence on appeal for mere inequity or disparity. Such a review is to be conducted by the Sentence Review Division.'" State v. Almanza (1987), 229 Mont. 383, 386, 746 P.2d 1089, 1090-91 (quoting State v. Lloyd (1984), 208 Mont. 195, 199, 676 P.2d 229, 231).

We hold that the District Court did not abuse its discretion in sentencing Evans.


VII

Did the District Court properly exclude Evans' parents, who were potential witnesses, from the courtroom?

Evans complains that the District Court should not have excluded his parents from the courtroom because it deprived him of their comfort and support during the trial.

Sequestration of witnesses is a matter of discretion with the court. State v. Radi (1975), 168 Mont. 320, 326, 542 P.2d 1206, 1210. Although Evans' parents did not testify, they were listed as potential witnesses at the beginning of the trial. We hold that the District Court did not abuse its discretion in excluding Evans' parents from the courtroom since they were potential witnesses.

17

Affirmed.

_____
Diane G. Barz
Justice

We concur:

_____
P. A. Turnage
Chief Justice

_____
John Conway Harrison

_____

_____
John C. Sheehy

_____
R. C. McDonough

_____
William E. Hunt
Justices

18