

DA 11-0740

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 293

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

SHANNON DAVID McCOY,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Mineral, Cause No. DC 10-21
Honorable Karen Townsend, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Joseph P. Howard, Attorney at Law, Great Falls, Montana

      For Appellee:

          Steve Bullock, Montana Attorney General; Micheal S. Wellenstein, Assistant
Attorney General, Helena, Montana

          Marcia Boris, Mineral County Attorney, Superior, Montana

                Submitted on Briefs:   October 17, 2012
                         Decided:   December 18, 2012

Filed:

_____
                      Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1 Defendant Shannon David McCoy ("Shannon") appeals his conviction of attempted theft in the Fourth Judicial District Court, Mineral County. We affirm.

## ISSUE

¶2 We restate the sole issue on appeal as follows:

¶3 Whether the District Court abused its discretion by finding a sufficient chain of custody for the admission of latent fingerprint evidence?

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 Around 3:00 a.m. on August 4, 2010, Cara Schmeling ("Cara"), a cashier at the Travel Center ("Center") in St. Regis, Montana, heard the Center's back door alarm sound. The back doors are generally locked, and the alarm will trigger if they are opened without being unlocked first. Cara immediately investigated the alarm but did not find anyone. Cara returned to the front of the store and proceeded to write a note to Gary Bullock ("Gary"), owner of the Travel Center, telling him to check the Center's surveillance video in the morning. Cara then received a call from an unknown man insisting, eventually even screaming, that Cara should check the door to the office where the Center's safes were located. Cara, accompanied by the Center's maintenance man, went to check the "money room." There, they found the door to the money room had been propped open with a paperback book and one of the Center's safes had been moved from its normal position on the floor onto a chest freezer. The door to the money room has an automatic, keypad-operated electronic lock, and only the Center's employees had access to the code. Cara then

2

attempted to call Gary but was only able to reach his wife, Muffy. Cara informed her that someone had attempted to take a safe. After the call to Muffy, Cara called the police, and Mineral County Undersheriff Mike Johnson ("Officer Johnson") responded.

¶5    Upon his arrival at the Center, Cara showed Officer Johnson the money room. Officer Johnson noted that the door to the money room did not appear to have been forced open. Once inside the room, Officer Johnson observed that one of the safes had been moved on top of a chest freezer. Cara opened the safe in Officer Johnson's presence to verify the money was still inside and Officer Johnson arranged to return later that morning to view security camera tapes with Gary.

¶6    Both the hallway leading to the money room and the money room have security cameras. The hallway video showed a man covering his face with his hands while propping open a back door. After opening the door, the man entered the restroom and shortly reemerged wearing a hood. The hallway video then showed the man enter the money room. Inside the money room, the video showed the man lift a safe and place the safe on the chest freezer after attempting to open the door. Despite the man's attempts at concealing his face with his hands and hood, his profile was at times visible.

¶7    Before Officer Johnson viewed the tape, Cara told him that she believed Shannon was a suspect. Cara had viewed the tape with Gary, and she testified that she recognized Shannon's profile, posture, and walk on the surveillance video. Cara knew Shannon from a previous job as a waitress, and she occasionally saw him when he would visit his girlfriend, a former waitress at the Center. Gary also recognized Shannon in the surveillance tape, having

3

become familiar with him when both his mother and girlfriend worked at the Center. Importantly, Gary testified that Shannon's girlfriend had known the code to the money room when she worked at the Center, and testified that the code had not been changed since she left.

¶8 Officer Johnson recognized Shannon's profile in the tape as well, and testified that he knew Shannon from prior encounters. Officer Johnson was also able to see that the person in the tape was not wearing gloves, and he fingerprinted the safe where he observed the suspect handle it. Officer Johnson used two hinged fingerprint cards to take the prints. This type of card consists of two halves, one made of cardboard and one made of transparent adhesive plastic. Once a print is lifted with the adhesive plastic half, it is folded over onto the cardboard half, sealing the print in between. Officer Johnson testified that once this step is complete, the print is locked in place and protected from being tampered with. He also testified that after securing the prints, he generally marks the back of the card with the corresponding location, time, date, and case number. However, the dates noted on the backs of the cards conflicted. One card's note indicated that the prints had been taken on August 6, 2010, while the other read August 4, 2010. Officer Johnson explained the notation of August 6, 2010, on one card as "just a mistake on my part," and claimed he was "a hundred percent certain" that he lifted both sets of fingerprints on August 4, 2010.

¶9 Officer Johnson also departed from his usual habit in his subsequent handling of the fingerprint cards. After collecting the prints, Officer Johnson placed the cards in his briefcase, which apparently stayed in his patrol car for several weeks. Officer Johnson

4

testified he is "pretty religious" about locking the car and the cards remained there until Officer Johnson logged them into evidence on August 20, 2010. However, Officer Johnson logged the cards out of evidence immediately after logging them in, intending to send them to the crime lab. Instead of sending them to the lab, Officer Johnson placed the cards on a shelf in his office, the door to which automatically locks when closed. As with his patrol car, Officer Johnson testified that he habitually closes his door, thereby locking it, whenever he leaves the immediate area. That area of the sheriff's office also requires a key to enter. Officer Johnson testified that he eventually took the two cards to the state crime lab on either September 22 or 23, 2010, where a latent fingerprint analysis was performed. Officer Johnson further testified that the cards were in the same condition when he delivered them to the crime lab as they had been when he collected them on August 4, 2010. The lab's subsequent analysis compared the recovered prints to Shannon's and determined that they matched.

¶10     At the State's request, the court held a hearing on the morning of trial outside the jury's presence concerning Shannon's objection that the State had failed to establish a secure chain of custody for the print cards. There, Officer Johnson testified to the storage of the cards in his locked patrol car and locked office, and asserted "[t]here is no way they [the cards] were tampered with. Absolutely not." Following brief argument, the court found that the State had provided sufficient foundation for the print cards, citing *State v. Bowser*, 2005 MT 279, 329 Mont. 218, 123 P.3d 230; *State v. DuBray*, 2003 MT 255, 317 Mont. 377, 77 P.3d 247; and *State v. Weeks*, 270 Mont. 63, 891 P.2d 477 (1995). The court thereafter

5

admitted the print cards into evidence at trial, overruling Shannon's previous objections on foundation. The jury subsequently found Shannon guilty of attempted theft, and the court sentenced Shannon to a term of ten years at Montana State Prison. This appeal followed.

## STANDARD OF REVIEW

¶11 This Court grants trial courts broad discretion on evidentiary matters, and "[t]he determination of the adequacy of the foundation for the admission of evidence is within the discretion of the trial court, and will not be overturned absent a clear abuse of discretion." *Weeks*, 270 Mont. at 75, 891 P.2d at 484.

## DISCUSSION

¶12 *Whether the District Court abused its discretion by finding a sufficient chain of custody for the admission of latent fingerprint evidence?*

¶13 When establishing the chain of custody, "the State has the burden to make a prima facie showing of a continuous chain of possession and that there was no substantial change in the evidence while it was in its possession." *Weeks*, 270 Mont. at 75, 891 P.2d at 484. The State does not need to show that it possessed the evidence at all times, and it "need only demonstrate to the court's satisfaction that no substantial change occurred" from the time the evidence was gathered to the time it was tested or offered. *Bowser*, ¶ 30. Importantly, we do not require the State to prove that it would be *impossible* to tamper with the evidence, just that there was no substantial change. *State v. Wells*, 202 Mont. 337, 356, 658 P.2d 381 (1983). Once the State makes the prima facie showing, the burden shifts to the defendant to show that the evidence has been tampered with in the State's custody. *Bowser*, ¶ 30.

6

¶14 On appeal, Shannon contends the District Court erred in admitting the latent print evidence and forensic analysis by claiming that the State failed to establish a sufficiently secure chain of custody for the print cards. Shannon specifically takes issue with the discrepancies between the dates on the back of the cards and their storage in Officer Johnson's patrol car and office. Because the cards were not stored in an evidence room, Shannon claims that the State, through Officer Johnson's testimony, could not establish that the cards had not been tampered with. Shannon alternatively argues that even if the State met its prima facie burden, he has cast sufficient doubt upon the integrity of the evidence to justify remanding the case to the trial court.

¶15 Conversely, the State answers that testimony established there was no substantial change in the print cards from the time the prints were lifted from the safe to the time the cards were delivered to the crime lab. The State bases this assertion on Officer Johnson's testimony that the cards were kept in his locked patrol car and locked office, that the way in which the cards sealed prevented tampering, and that the cards were in the same condition when he took them to the crime lab as when he lifted them. The State argues that this testimony established that there had been no substantial changes to the cards, meeting their prima facie burden.

¶16 While the conduct of Officer Johnson may not have been ideal, we agree that his testimony met the prima facie burden enunciated in *Weeks*, as it established both a continuous chain of possession and that no substantial change in the cards' condition had occurred. *Weeks*, 270 Mont. at 75, 891 P.2d at 484. As noted, we will not require the State

7

to prove that it would have been *impossible* to tamper with the cards while they were stored in Officer Johnson's car or office, and we do not require that evidence be stored in an evidence room. *See State v. Grant*, 221 Mont. 122, 134, 717 P.2d 562 (1986) (affirming the trial court's admission of bullets and cartridges stored in an undersheriff's office before being sent to the crime lab). The State must only show that the cards were in a substantially similar condition when taken to the lab. Officer Johnson testified that they were, and the District Court determined this was sufficient to meet the State's burden. We agree.

¶17 This decision was a valid exercise of the court's discretion, and once made, it shifted the burden to Shannon to prove that the cards had been tampered with. *Bowser*, ¶ 30. However, Shannon failed to offer *any* proof that the cards had been tampered with. Instead, Shannon argued "that if this evidence had been tampered with, [Officer] Johnson would not be aware of it." The District Court rightly rejected Shannon's argument as mere speculation. Indeed, we have recognized that a defendant's failure to produce *any* evidence "to show actual or even potential tampering could have occurred" does not satisfy their burden, *Grant*, 221 Mont. at 134, and we require defendants "to show affirmatively that tampering [has] taken place." *State v. Thomas*, 166 Mont. 265, 268, 532 P.2d 405 (1975). Shannon did not attempt to affirmatively show the print cards had been tampered with, instead arguing *if* they had been, the State would not know. This was insufficient to meet his burden under *Bowser* and *Weeks*, and the District Court's finding that the State provided a sufficient foundation for the print cards was not a clear abuse of discretion.

8

¶18 Shannon's speculations are insufficient to render the court's decision to admit the cards a clear abuse of discretion. The State offered Officer Johnson's testimony that the cards were not substantially changed while in his possession, and Shannon failed to affirmatively rebut this with any actual evidence of tampering. Moreover, protestations concerning discrepancies between dates written on the back of the cards or dates entered in an evidence log book properly go "to the weight rather than the admissibility of the evidence." *Grant*, 221 Mont. at 134 (noting that defendant's arguments attacking the marking and identification of evidence went to the weight of the evidence).

## CONCLUSION

¶19 Because the State adequately established the print cards' chain of custody, we find that the District Court did not abuse its discretion by admitting the latent print evidence. We accordingly affirm Shannon's conviction.

/S/ MICHAEL E WHEAT

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ BRIAN MORRIS
/S/ JIM RICE

9