No. 94-023

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

STATE OF MONTANA,

     Plaintiff and Respondent,

  -v-

MICHAEL WEEKS,

     Defendant and Appellant.

FILED

FEB 16 1995

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:  District Court of the First Judicial District,
               In and for the County of Lewis & Clark,
               The Honorable Dorothy McCarter, Judge presiding.

COUNSEL OF RECORD:

       For Appellant:

       Steven J. Shapiro, Clancy, Montana

       For Respondent:

       Hon. Joseph P. Mazurek, Attorney General, Cregg
       Coughlin, Assistant Attorney General, Helena,
       Montana; John Flynn, Broadwater County Attorney,
       Townsend, Montana

Submitted on Briefs: November 10, 1994

Decided: February 16, 1995

Filed:

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

Defendant/Appellant, Michael Weeks, was charged with sexual intercourse without consent, a felony in violation of § 45-5-503, MCA (1991), alleged to have occurred on or about October 17, 1991. After a jury trial held in the First Judicial District, Lewis and Clark County, Weeks was convicted of the charge, and the District Court entered its Judgment and Order on September 22, 1993, sentencing Weeks to 35 years in prison with 15 years suspended. Weeks appeals his conviction. We affirm.

Weeks raises five issues on appeal.

1. Whether he was denied his right to a speedy trial?

2. Whether the District Court abused its discretion in finding a sufficient chain of custody for the blood specimens?

3. Whether the District Court abused its discretion in admitting evidence of serological and DNA testing?

4. Whether the District Court properly denied Weeks' motion for a judgment of acquittal?

5. Whether the District Court abused its discretion when it excluded evidence of prior sexual abuse of the victim?

FACTUAL BACKGROUND

In the fall of 1991, the victim, C.R., was in the seventh grade and living in Townsend, Montana, with her mother, two brothers and her stepfather, Weeks. In December of 1991, C.R. went to a doctor in Townsend, who determined that C.R. was pregnant. C.R. testified that from the time she was eight years old until she left the home, Weeks would have sex with her two to three times a week. C.R. stated that the incidents would usually take place in

2

the morning, after her mother had left for work, and before her brothers had awakened.

In January of 1992, Cheryl Rolfe, a social worker for the Montana Department of Social Services working in Broadwater County received an anonymous referral stating that C.R. was pregnant. As a result of this referral, Rolfe interviewed C.R. at school, and C.R. told Rolfe that Weeks had impregnated her. Rolfe immediately placed C.R. in a foster home, where she stayed until January 31, 1992, at which time Rolfe placed C.R. at the Florence Crittenton Home. Rolfe stated that she specifically told C.R.'s mother not to make any contact with C.R. including telephone calls, unless it was first approved by Rolfe. C.R. stated that while she was staying at the foster home, her mother and Weeks called her and asked her to change her testimony and claim someone else was the father of the child.

On July 20, 1992, C.R. gave birth to a baby boy. C.R. testified that Weeks was the only person she had ever had sexual intercourse with. Weeks denies that he is the father of the child, and presented evidence that C.R.'s brother could have been the potential father.

The Montana State Crime Lab received blood samples from C.R., the baby, Weeks, and C.R.'s brother. Julie Long, a forensic scientist working at the State Crime Lab testified that she ran serological tests on the blood samples and determined that Weeks was included as a possible father of the baby. According to Long, C.R.'s brother was positively excluded as the baby's father.

The State sent blood samples from C.R., the baby, and weeks to Genelex Corporation, a paternity testing laboratory in Seattle, for DNA analysis.  The president of Genelex, Howard Coleman, testified that the DNA analysis evidence demonstrated that Weeks could not be excluded as the baby's father.  In addition, Genelex conducted a statistical analysis of the DNA testing results and determined that Weeks was 154,000 times more likely to be the baby's father than a random man.

Weeks was arrested on October 30, 1992, and charged with sexual intercourse without consent.  A jury trial was held July 26 through July 28, 1993, and Weeks was found guilty of the charge. Additional facts will be presented as is necessary for the discussion of the issues.

## 1.  SPEEDY TRIAL

Although not reflected in the District Court record, Weeks maintains, and the State does not dispute, that Weeks was charged by complaint in Broadwater County Justice Court in October of 1992, and arrested on October 30, 1992.  An information charging Weeks was filed on November 17, 1992, and during Week's arraignment, which was held on December 4, 1992, the court set the original trial date for the week of April 12, 1993.  On February 9, 1993, Weeks requested documentation of the DNA testing Genelex conducted. The State produced the documentation on March 18, 1993.  On March 31,1993, Weeks moved for a continuance of the trial date scheduled for April 12, 1993 to May 17, 1993, alleging that his expert needed additional time to review the DNA testing documentation.  Weeks

4

specifically waived his right to a speedy trial in his motion,

The District Court granted Weeks' motion for a continuance, and a second trial date was scheduled for May 17, 1993. On May 3, 1993, Weeks moved to exclude scientific evidence, which included the evidence of the DNA testing, statistical probabilities based on the DNA and serological tests, and references to the terms "match" and "fingerprints." The State objected to Weeks' motion to exclude on May 5, 1993, alleging that "[t]he very nature of Defendant's motion begs for an evidentiary hearing to address the issues raised by the Defense." The State requested that the court vacate the May 17 trial date and hold an evidentiary hearing on Weeks' motion. After giving preliminary consideration to Weeks' motion on May 7, the court decided a hearing was necessary to determine the admissibility of the scientific evidence, and therefore rescheduled trial for July 26, 1993.

On June 21, 1993, Weeks filed a motion to dismiss on the grounds that he was denied his right to a speedy trial. Weeks alleged the State was responsible for the delay because it took six weeks to respond to his discovery request and because it moved to vacate the trial and hold a hearing on his motion to exclude the scientific evidence. After a hearing held on July 2, 1993, the court denied his motion.

The Sixth Amendment to the United States Constitution, and Article II, Section 24 of the Montana Constitution, guarantee a criminal defendant the right to a speedy trial. State v. Stewart (1994), 881 P.2d 629, 632, 51 St.Rep. 910, 911. This Court applies

5

the four part test set forth in Barker v. Wingo (1972), 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101, to determine whether a criminal defendant has been denied his right to a speedy trial. State ex rel. Briceno v. District Court (1977), 173 Mont. 516, 568 P.2d 162. The four factors which must be evaluated are the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Barker, 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117; State v. Thompson (1993), 263 Mont. 17, 31-32, 865 P.2d 1125, 1134. No particular factor is determinative, rather, all four factors must be weighed in light of the surrounding facts and circumstances. Stewart, 881 P.2d at 632.

The first factor, the length of the delay is the threshold factor, as the other three factors need not be considered unless the length of the delay is presumptively prejudicial. Thompson, 865 P.2d at 1134. In this case, the State concedes that the 269 day pretrial delay is sufficient to warrant additional speedy trial analysis. See, Thompson, 865 P.2d at 1135, "[a] delay of over 200 days will usually trigger further analysis." Therefore, we consider the remaining three factors.

The second factor, the reason for the delay, requires an allocation of portions of the overall delay to the party responsible for causing any given period of delay. Thompson, 865 P.2d at 1135.

The delay in this case may be divided into three separate segments. The first period consists of 164 days and represents the time between Weeks' arrest on October 30, 1992, and the original

6

trial date of April 12, 1993. Because the District Court set the original trial date, the delay is considered institutional, and is therefore chargeable to the State. Thompson, 865 P.2d at 1135. "However, institutional delay weighs less heavily against the State than does purposeful delay." Thompson, 865 P.2d at 1135. Weeks makes no argument, and the record does not indicate, that the State purposefully caused the delay between his arrest and the first scheduled trial date, which is by far the longest period of delay. Therefore, we weigh this initial 164 days less heavily against the State.

The second period of delay consists of 36 days, and represents the time between the original trial date of April 12, 1993, and the trial date set for May 17, 1993. The defendant requested this delay in his motion for continuance, wherein he specifically waived his right to a speedy trial. On appeal, Weeks contends that the State should be responsible for this delay, as it did not timely respond to his request for discovery. Nevertheless, Weeks specifically waived his right to a speedy trial until May 17, 1993. Therefore, the second period of delay is attributable to Weeks. State v. Tilly (1987), 227 Mont. 138, 143, 737 P.2d 484, 487; see also, State v. Nelson (1991), 251 Mont. 139, 822 P.2d 1086.

The third period of delay consists of 69 days, and represents the delay between the court's vacating the May 17 trial date and rescheduling the trial for July 26, 1993. Weeks maintains that this delay should be attributable to the State, as it moved to vacate the May 17 trial date. While the State agrees that it

requested that the trial date be vacated, it argues that the delay should be attributed to Weeks, as the delay was caused by Weeks' motion to exclude the DNA evidence. The State alleges that in light of Weeks' motion to exclude, an evidentiary hearing was necessary at which expert witnesses could testify. We agree, and conclude the delay should be attributable to Weeks in this instance for the following reasons.

First, Weeks did not move to exclude the evidence until two weeks before trial, although he admits that the DNA testing was completed by October 1992. Second, the evidence Weeks sought to exclude is highly complicated and technical scientific evidence. At the time Weeks made his motion, this Court had never ruled on the admissibility of DNA evidence in a criminal trial. Therefore, this evidence was clearly of the type which required a pretrial admissibility hearing. Given the complexity of the subject matter and the timing of Weeks' motion to exclude, the State's motion for an evidentiary hearing was proper, and the District Court **was** correct in granting the State's motion. State v. Moore (1994), 885 P.2d 457, 471, 51 St.Rep. 1151, 1160; U.S. v. Martinez (8th Cir. 1993), 3 F.3d 1191, 1197-98, cert denied, ___ U.S.___, 114 S.Ct. 734, 126 L.Ed.2d 697 (1994). Accordingly, we conclude that Weeks should be charged with this 69 day delay.

Weeks has met the third Barker factor, assertion of his right, as he moved to dismiss the action on speedy trial grounds, on June 21, 1993, before this case was brought to trial. Stewart, 881 P.2d at 633.

The fourth Barker factor is prejudice to the defendant. Prejudice is assessed in light of the interests of the defendant which may be harmed by a delay in bringing his case to trial. These interests are: (1) pretrial incarceration, (2) anxiety and concern, and (3) impairment of defense. Stewart, 881 P.2d at 633. Applying these criteria to the facts in this case we conclude that Weeks was not prejudiced by the delay.

Weeks, incarcerated from the date of his arrest to the date of trial, argues that his incarceration was oppressive and impaired his defense. However, given the fact that Weeks had been extradited from Oregon and had few ties to Broadwater County, pretrial incarceration was necessary to ensure his presence at trial.

Regarding the second interest, Weeks maintains that "[t]he anxiety caused by loss of liberty is great." While this may be true, Weeks offers no proof conclusively showing that he actually suffered anxiety and concern. This Court has recognized that anxiety is an inevitable part of being charged with a crime, and that the existence of anxiety and emotional distress are notoriously difficult to prove. Stewart, 881 P.2d at 634. However, we have also held that the State's burden to show lack of anxiety lessens considerably when marginal evidence of anxiety is presented. State v. Eklund (1994), 264 Mont. 420, 425, 872 P.2d 323, 326. While Weeks mentions that he was suicidal as a result of his pretrial incarceration, he offered no support for this cursory statement. Weeks' evidence demonstrating anxiety and concern is

9

marginal at best.

The third and most important interest we must consider is whether the delay impaired or prejudiced the defense. Again Weeks offers no explanation as to how his defense suffered as a result of the delay other than stating that "[t]he defense was impaired by the passage of time." A mere self-serving assertion that the defendant suffered prejudice is not sufficient to demonstrate that the delay impaired or prejudiced his defense. State v. Bretz (1979), 185 Mont. 253, 268, 605 P.2d 974, 983; see also, State v. Kills on Top (1990), 243 Mont. 56, 79, 793 P.2d 1273, 1288-89.

In summary, of the total 269 days of pretrial delay, 164 days are institutional, charged to but weighed less heavily against the State, and 105 days are charged to Weeks. While Weeks may have suffered some anxiety as a result of his pretrial incarceration, that incarceration was necessary and his defense was not prejudiced by the delay. Therefore, applying the four part balancing test of Barker, we hold that Weeks was not denied his right to a speedy trial.

## 2. CHAIN OF CUSTODY

Weeks contends that the State did not establish a proper foundation for the chain of custody for the blood samples taken from C.R., the baby, and Weeks. Accordingly, Weeks maintains that the District Court erred in admitting any evidence regarding the blood samples and the accompanying test results. Weeks claims that the blood samples of C.R. and the baby should not have been admitted because those samples were mistakenly sent to Baltimore Rh

Typing Laboratory, a genetic testing center in Baltimore, Maryland, when they were supposed to have been sent to Genelex Corporation in Seattle, Washington. When the mistake was discovered, the samples were forwarded to Genelex. Weeks maintains that the chain of custody for these two samples was not established because while at the Baltimore laboratory, "[t]he samples could have been opened, examined, tested, contaminated and resealed before anyone realized that they did not belong there."

Weeks also argues that the State did not establish a proper chain of custody for his blood sample because Genelex did not follow the procedure set forth in its laboratory manual in identifying the sample. In addition, the State Crime Lab received a sample of Weeks' blood from Genelex for the purpose of conducting standard serological tests on the sample. Julie Long, a forensic serologist at the State Crime Lab, testified that the "blood vial" was broken when she received it. Ms. Long testified that the broken blood vial was inside of another plastic tube which was sealed, and that any glass residue from the breakage would not have affected the outcome of her testing, nor would any bacterial contamination have affected the outcome of her testing. However, Weeks maintains that it is not clear whether Genelex tested from that broken sample which could have affected the outcome of its testing.

In deciding whether to admit evidence concerning the blood tests results, the District Court had to determine whether a proper foundation had been laid. Specifically, the court had to determine

if the blood samples used for the DNA and serological testing were the same blood taken from Weeks, C.R., and the baby. Therefore, the State had to establish a complete and secure chain of custody from the time the blood was drawn until the time of testing. The District Court found the State properly established this chain of custody. We agree.

The determination of the adequacy of the foundation for the admission of evidence is within the discretion of the trial court, and will not be overturned absent a clear abuse of discretion. State v. Wells (1983), 202 Mont. 337, 356, 658 P.2d 381, 391; State v. Christenson (1991), 250 Mont. 351, 359, 820 P.2d 1303, 1308. When identifying evidence by a chain of custody, the State has the burden to make a prima facie showing of a continuous chain of possession and that there was no substantial change in the evidence while it was in its possession. State v. Thomas (1975), 166 Mont. 265, 268-69, 532 P.2d 405, 406-07; Wells, 658 P.2d at 391. The burden then shifts to the defense to show that the evidence has been tampered with while in the State's custody. State v. Armstrong (1980), 189 Mont. 407, 432, 616 P.2d 341, 355; Wells, 658 P.2d at 391.

While other cases have stated that the State must make a prima facie showing that the evidence was in the "State's continuous possession", see e.g., State v. Evans (1991), 247 Mont. 218, 228, 806 P.2d 512, 518, this language is not completely accurate. The State does not need to show that it had possession at all times; rather it must establish a continuous chain of custody. For

12

example, as here, when the State ships a piece of evidence to a laboratory for testing, the evidence necessarily leaves the "State's possession." At times the post office or parcel carrier has possession of the evidence; at times the evidence is in the possession of clerks; and at other times laboratory technicians have possession. The chain of custody is not broken however, so long as the State can demonstrate to the court's satisfaction, that from the time the evidence was gathered to the **time** it was tested, (if testing was performed), or to the time it was offered, that there was no substantial change that would affect the character of the evidence, the accuracy of the test results, or its probative value and authenticity.

Weeks first argues that the State did not demonstrate a complete chain of custody for the blood samples taken from C.R. and her baby because the samples were mistakenly shipped to the Baltimore lab. Weeks also alleges that the samples could have been tampered with while there. However, the record does not support Weeks' contentions. While it is true that the medical technologist who originally withdrew the blood samples from C.R. and the baby shipped them to Baltimore RH Typing Laboratory, the State demonstrated that it contacted the Baltimore lab the same day the lab received the samples and instructed it to send the samples to Genelex. The chain of custody documentation evidences the following: (1) the Baltimore lab received the samples on July 23, 1992, at 8:35 a.m.; (2) a lab worker opened the shipping package and noted that blood samples' condition was fine; (3) the State

13

contacted the Baltimore lab by facsimile that same day and requested that the samples be shipped to Genelex; (4) the Baltimore lab shipped the samples to Genelex on July 23, 1992; and (5) Genelex received the samples the next day. Furthermore, Howard Coleman, the president of Genelex, testified that the evidence tape sealing the samples was intact, and there was no evidence that the samples themselves had been opened or tampered with in any way.

This Court has previously held that it is not necessary for the State to call as witnesses at trial each person who handled the evidence in order to establish a chain of custody. State v. Bradley (1993), 262 Mont. 194, 198-99, 864 P.2d 787, 790. In Bradley, we held that testimony concerning the chain of custody from the time a blood sample was drawn, to when it was shipped, along with the laboratory log listing the names of the persons at the lab who handled the evidence was sufficient to establish chain of custody foundation. Bradley, 864 P.2d at 790. Likewise, here we conclude that the documentation and testimony outlined above, demonstrates a sufficient chain of custody of the samples from the time they were withdrawn from C.R. and her baby until the time the tests were conducted.

Regarding the tampering allegation, Weeks failed to present any evidence that the sealed samples were actually altered or tampered with in any way. The State's evidence, in fact, was to the contrary. Accordingly, we conclude that this argument has no merit. Armstrong, 616 P.2d at 355.

Weeks' next contention concerns the sample of blood withdrawn

14

from him. Weeks argues that the State failed to establish a foundation for the admission of his blood sample because the sample did not comply with "mandatory identification requirements." Weeks suggests that because the procedure used to identify the blood sample in this case did not follow the identification procedures set forth in Genelex's lab manual, i.e., the sample was not accompanied by a signed fingerprint or signed photograph, Genelex had no means of connecting the sample to Weeks. Weeks relies on State v. McDonald (1985), 215 Mont. 340, 697 P.2d 1328, as support for his argument that failure to follow the requirements of the administrative rules of Montana is analogous to failure to follow a laboratory manual. We disagree, and conclude there was sufficient evidence to prove that the blood sample Genelex tested was the same sample withdrawn from Weeks, as is evidenced by the following facts.

John Oritz testified that in February 1992, while he was employed as an investigator for the Broadwater County Attorney's Office, he received a signed consent from Weeks to take a sample of Weeks' blood. Oritz and Weeks went to the Broadwater Health Center in Townsend, where Katherine Carr, a medical technologist, drew three vials of Weeks' blood. Carr testified that she labeled the vials with Weeks' name, the date, and the time of the procedure. Carr then packed the samples and gave them to Oritz. Carr also testified that Oritz watched the procedure, and that she personally knew Weeks.

Oritz testified that he placed evidence tape over the sample's

lids, and stored them in the evidence refrigerator at the sheriff's office until he mailed them to Genelex through registered mail. Genelex's chain of evidence documentation indicates it received the samples by registered mail on February 24, 1992.

Coleman testified that while Genelex's laboratory manual states that a sample should be accompanied by a signed fingerprint or signed photograph, he also stated that it was impossible for the manual to cover every eventuality that might occur. Coleman explained that Genelex would accept a specimen which deviated from the procedures contained in the laboratory manual if it followed accepted laboratory practice and forensic and law enforcement practice in terms of the maintenance of custody. Coleman added:

> The typical kinds of cases in which we don't have that sort of documentation [i.e., documentation set forth in Genelex's laboratory manual] is the case exactly such as this one, a criminal case where one of the parties who has been drawn has been in custody of a law enforcement officer at the time of the blood draw and the law enforcement officer will provide the specimen to us on their chain of custody forms and they will sign off on it and send it to us then in an appropriate manner.

Coleman also testified that the identification procedure set forth in its lab manual was merely administrative procedure which did not affect the laboratory procedure, and did not invalidate the testing. Finally, Coleman noted that in this case, "the bottom line is that the chain of custody was maintained." Accordingly, we conclude that Weeks' allegation that the State failed to establish a proper foundation for chain of custody for his blood sample is also without merit.

Finally we address Weeks' argument that Genelex could have

16

tested from the broken **sample** received by the **Montana** State Crime Lab, and returned to Genelex. The record again demonstrates that Genelex did not test from this sample because Coleman testified that Genelex did not use the sample it received from the crime lab for testing, but rather conducted the tests using the original samples. Therefore, we conclude that Weeks did not demonstrate the blood sample Genelex used for testing had been contaminated while in the State's possession.

Upon considering all of Weeks' allegations of error, we hold that the District Court did not abuse its discretion in admitting evidence of the blood samples and the test results thereof.

### 3. DNA AND SEROLOGICAL EVIDENCE

#### Background

Before we begin our discussion of the alleged errors concerning the DNA and serological analysis evidence, a brief overview of the DNA and statistical analysis conducted in this case is necessary.

DNA makes up units called chromosomes. In the nucleus of each cell there are 46 chromosomes arranged in 22 pairs plus one pair of sex chromosomes. An individual inherits one-half of his or her chromosomes from the father, and one-half from the mother. Therefore, scientists are able to determine a genetic profile of the father of a child by examining the genetic traits of the mother and her child.

> DNA analyses are frequently used in paternity cases. In the typical case, laboratories perform genetic tests on the mother, child, and alleged father to arrive at a so-called 'paternity index.' This is a measure of the

17

strength of the genetic evidence, where higher numbers are more probative of paternity than lower numbers. Essentially, it is a ratio of the chance that the alleged father, if he was the father, would transmit the genetic markers observed in the child to the chance that a randomly selected man from the reference population, if he was the father, would pass along these markers.

Koehler, DNA Matches and Statistics, 76 JUDICATURE, 222, 224 (1993).

In this case, Genelex conducted the DNA paternity testing using a process called Restriction Fragment Length Polymorphism analysis (RFLP). As explained in Moore, 855 P.2d at 465-66, RFLP analysis involves several steps: extraction of the DNA from the evidentiary sample; fragmentation (cutting) of the DNA molecules at specific sites into restriction fragments; assortment of the fragments by gel electrophoresis; Southern transfer, a process which transfers the DNA fragments onto a nylon membrane; hybridization with radioactive probes; and production of autoradiographies (autorads) by placing x-ray film over the nylon membrane, thereby revealing the restriction fragments (or alleles), which appear as dark bands on the film.

Genelex used four different probes to analyze the DNA profile of C.R., the baby, and Weeks. Specifically, Genelex examined certain loci (or sites) on chromosomes two, four, ten and seventeen, to determine whether Weeks and the baby shared a common band at each location. For each locus examined, Weeks has a gene which is indistinguishable from the baby's obligate (paternal) gene.

The next step, the statistical analysis, attempts to determine how often the particular bands would occur in the

relevant racial population, thereby demonstrating how frequently the genes of the alleged father occur in the relevant racial population. To make this statistical analysis, Genelex prepared a database which is comprised of DNA profiles of several hundred people to determine the sizes of specific DNA fragments (alleles) in all the individuals tested. The scientists then determine how often a particular allele occurs within the database.

To determine how often an allele is found within the database, Genelex uses a process called "binning," whereby the alleles are separated by size range and assigned to separate bins. For example, an allele which is comprised of approximately 2,500 base pairs is placed into a bin with alleles which are comprised of between 2,000 and 3,000 base pairs. Once an allele is assigned to a bin, the scientist determines how frequently it occurs within the database.

The scientist then compares the alleles in question (in this case the alleles shared between Weeks and the baby) to the alleles generated from the database. Then using certain basic formulas from population genetics, the scientist makes a statistical determination of how frequently that particular allele is found in the same racial population.

Here, Genelex examined four probes, determined how frequently they were found in the database, and then, using a multiplication or product rule computed an aggregate estimate of the statistical probability that the combination of alleles would be found in the relevant racial population. For example, if one allele is found in

19

ten percent of the population, and another allele is found in fifty percent of the population, scientists, (knowing that the occurrence of these genes is independent of each other) apply the product rule and conclude that the probability of a coincidental match on both alleles is 0.10 x 0.50 = 0.05 or a five percent probability.

Upon completing the statistical analysis, Genelex concluded that Weeks "is 154,000 times more likely to be the father of the baby . . than a random man."

## Discussion

Weeks argues that the District Court erred in admitting the DNA evidence and its accompanying statistical data on several grounds. We will first address Weeks' objections to the DNA testing evidence, and then his objections to the statistical evidence.

## Standard of Review

Rulings on the admissibility of evidence are left to the sound discretion of the trial court, and the court's decision will not be overturned absent an abuse of discretion. <u>Moore</u>, 885 P.2d at 467.

## A. DNA Analysis Evidence

Weeks asserts that evidence of the DNA testing in general, should not have been admitted because one set of standards does not govern the industry. Weeks concludes that because the industry uses various standards for testing, the laboratories do not have guidelines concerning what procedures will be acceptable to the courts , and likewise, the courts cannot be assured that the results will be consistent from one laboratory to another.

20

While Weeks is correct in stating that one standard does not govern the industry, that fact does not, in and of itself, impair the reliability of the DNA analysis evidence. Weeks' own expert, Dr. Moses Schanfield, testified that there are several sets of standards governing the industry, citing: TWGDAM, or the Technical Working Group on DNA analysis and Methods; HCFA, the Health Care Finance Administration; and ASHE, the American Society of Histocompatibility and Genetics. Schanfield also noted that most laboratories that are engaged in paternity testing are accredited by the American Association of Blood Banks (AABB) and that:

> [while] there is no law requiring paternity testing laboratories [to] be accredited. . . . virtually every contract that comes out for parentage testing by a state or county agency requires that the laboratory be accredited or have applied for accreditation with the AABB so that even though there is no statutory requirement, there is a de facto one that exists.

Dr. Schanfield added:

> The standards should be considered minimal standards and they are not specific because -- to use a colloquialism there is more than one way to skin a cat. The reality is there is more than one way to test an enzyme and get the same results.

This Court has recently recognized that "the theory underlying DNA and RFLP technology is generally not open to serious attack. . ." Moore, 885 P.2d at 468. We also concluded that the general reason courts exclude RFLP analysis evidence is because the particular laboratory failed to adhere to generally accepted techniques for obtaining relevant, reliable results. Moore, 885 P.2d at 468-69.

In this case, Weeks fails to point out any errors in Genelex's

21

testing procedures. Genelex is certified by the American Association of Blood Banks. During the certification process, the AABB reviewed Genelex's laboratory procedure manual, inspected the various phases of the laboratory's operation, and its statistical methods. Upon completion of the certification process, the AABB issued Genelex a certification of accreditation. Accordingly, we conclude that Weeks' argument concerning the lack of standards governing DNA testing is without merit. See, <u>Moore,</u> 885 P.2d at 469.

## B. Statistical Evidence

Weeks also alleges that the State failed to lay a foundation for the admissibility of the DNA statistical analysis evidence. The essence of Weeks' argument is that Genelex's database was too small to project to a population of 100 **million** and that Genelex failed **to** make **statistical corrections to its** database.

Genelex's database is comprised of approximately 300 individuals. From this database, Genelex extrapolates to the frequency of a genetic occurrence within the United States' population. According to Weeks, Genelex's database is too small which is evident in the difference between the State expert's conclusion that there might be "dozens" of men who carry the genetic pattern which would show them to be the father of the baby, and the defense expert's conclusion that 12,000 men would have the same genetic pattern as the father of the baby. Dr. Schanfield, the defense expert, based his calculations on the FBI database of approximately 10,000 samples, while Mr. Coleman, the State's

22

expert, based his calculations on Genelex's database.

However, when questioned whether Genelex's database was too small, Schanfield testified that Genelex's data base was the minimum size to detect the bands being sought. Schanfield stated, "I think the Genelex data base like most starting databases is small. That is a reality of starting databases. Ours was that size once, too. All it means is there are inherently larger errors in it."

In addition, Coleman also agreed that calculations become more accurate using a larger data base. However, in Coleman's opinion, the differences would not be significant in light of the fact that the statistical probability is an underestimate of the true number.

In United States v. Bond (6th Cir. 1993), 12 F.3d 540, 558, the defendants also argued that the statistical probabilities of a match would have been more accurate if a different database had been used. Similar to the arguments raised here, the defendants in Bond did not challenge the fact that the probabilities were generated, but rather challenged the precision of the probability estimate. Bond, 12 F.3d at 558. The Sixth Circuit Court noted that the test for admissibility under Daubert v. Merrell Dow Pharmaceuticals, Inc. (1993), _____ U.S. _____, 113 S.Ct. 2786, 2796, requires only scientific validity for admissibility, not scientific precision. Bond, 12 F.3d at 558. The Bond court concluded that:

> [T]he criticisms about the specific application of the procedure used or questions about the accuracy of the test results do not render the scientific theory and methodology invalid or destroy their general acceptance.

23

These questions go to the weight of the evidence, not the admissibility.

Bond, 12 F.3d at 563.

Weeks does not contend that the scientific theory and methodology underlying the probability estimates were invalid. Rather, he argues that the conflicting testimony concerning the probability determinations, renders the evidence inadmissible. We disagree and conclude that the conflicting evidence was a matter of weight for the jury to decide. See, Barmeyer v. Montana Power Co. (1983), 202 Mont. 185, 193-94, 657 P.2d 594, 598 ("it is better to admit relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross-examination and refutation.") Accordingly we hold that the District Court did not abuse its discretion in admitting the statistical analysis evidence.

Weeks also asserts that the exaggerated opinion of the accuracy of DNA testing is prejudicial, as juries would give undue weight and deference to the statistical evidence. Weeks claims that "[t]he popular media and the DNA laboratories themselves have portrayed DNA testing as 99.99% accurate in demonstrating 'matches' of biological samples." Weeks concludes that the probability aspect of the DNA analysis invades the province of the jury to decide the guilt or innocence of the defendant.

Weeks relies on Rule 403, M.R.Evid., which allows a court to exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . ." Weeks cites Delaware v.

24

Pennell (Del.Super. 1989), 584 A.2d 513, to support his argument that the impact of statistics upon a jury can be overwhelming. However, we conclude that Pennell is unpersuasive, as the Delaware court specifically did not adopt the position that statistical analysis would never be proper. Rather, the Delaware court stated, "[i]n this case, however, the State has failed to demonstrate a degree of reliability necessary to admit such statistical probabilities." Pennell, 584 A.2d at 522.

Weeks also cites Commonwealth v. Curnin (Mass. 1991), 565 N.E.2d 440, and State v. Schwartz (Minn. 1989), 447 N.W.2d 422, to support his argument. We find these cases to be unpersuasive as well, as they were decided under the general acceptance test set forth in Frye v. United States (D.C. Cir. 1923), 293 F. 1013, which we rejected in Barmeyer.

We recognize that courts must be mindful that the probative value of statistical probabilities evidence is not outweighed by any unfair prejudicial effect. United States v. Chischilly (9th Cir. 1994), No. 92-10619, 1994 WL 382696, *9-*10; Bond, 12 F.3d at 567. However, Weeks presents no evidence in the record that supports his contention that the statistical analysis evidence had a prejudicial impact on the jury. Accordingly, we conclude that the statistical analysis evidence was more probative than prejudicial.

Weeks also alleges that the statistical analysis evidence invades the province of the jury. Weeks states that because he was charged with sexual intercourse without consent, the State must

25

prove that someone had sexual intercourse with the victim, and that it was done without consent. According to Weeks, because C.R. was 13 years old at the time of the crime, she was incapable of giving consent pursuant to § 45-5-501(1)(b)(iii), MCA, therefore, the proof of sexual intercourse alone is the fact in issue. The fact that C.R. had a baby "is in most circumstances, proof of sexual intercourse." Therefore, Weeks argues the **ultimate** factual issue is the identify of the perpetrator, which the statistics purport to **resolve.**

Weeks' argument has **no merit.** Rule, 704 M.R.Evid., provides:

Opinions on ultimate **issue.** Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

Here, the jury was entitled to consider the statistical analysis evidence along with all of the other direct and circumstantial evidence to determine the question of Weeks' guilt or innocence. The jury was free to disregard or discredit any of the evidence. Furthermore, we note that Weeks' arguments that the statistical evidence invades the province of the jury is weakened by the fact that he himself offered statistical probabilities of the DNA match for the jury's consideration.

The Iowa Supreme Court considered a similar argument in State v. Brown (Iowa 1991), 470 N.W.2d 30, 33. The Iowa Court concluded that such an argument:

will exclude statistical probability testimony where it is the most cogent, and allow it in evidence only where there remains a degree of doubt because of the inconclusiveness of the numbers. Where both are based on the same scientific methods and facts, this makes little

26

**logical sense. Indeed, it might lead to the exclusion of** fingerprint evidence, which is also based on the mathematical theory of probabilities that the chance of two individuals bearing the same fingerprint (or prints) is so infinitesimally small as to be negligible. [Citation omitted.]

Finally, Weeks argues that the court erred in allowing Coleman to testify concerning the statistical analysis generated by Genelex from the serological evidence because the State did not provide proper foundation.

The State Crime Lab conducted standard serological tests on the blood specimens of Weeks, C.R., and the baby, and determined that Weeks could not be excluded as the baby's father. The samples were analyzed for ABO antigen type, six red blood cell enzymes and one serum protein. Upon receiving the serology reports from the State Crime Lab, Genelex calculated a combined paternity index of 12.43; i.e., Weeks is 12.43 times more likely to be the baby's father than a random Caucasian-American man. Genelex then used the statistics generated from the serological tests and the statistics generated from the DNA analysis to reach a combined statistical analysis. Coleman acknowledged that the combined calculation was an approximation because he could not insure that the systems were "unlinked" to the DNA profiles. Coleman's testimony concerning these statistical analyses was offered and received into evidence at trial without objection.

The State argues that Weeks waived his objection concerning the admissibility of the combined statistical analysis evidence because he did not object to the foundation for the evidence at either the admissibility hearing or at trial. Weeks maintains that

27

he established and preserved his objection by filing a motion in limine before trial.   While a motion in limine may preserve a specification of error for appeal, State v. Brown (1984), 209 Mont. 502, 506-07, 680 P.2d 582, 584-85, that does not negate the obligation of the objector to make the basis and grounds for his objection clear to the court. "A district court will not be put in error where it was not given an opportunity to correct itself." Brown, 680 P.2d. at 584.   In  addition, specific objections must be made to portions of testimony deemed inappropriate; broad general objections do not suffice.   State v. Anderson (1984), 211 Mont. 272, 290, 686 P.2d 193, 202-03; State v. Courchene (1992), 256 Mont. 381, 385, 047 P.2d 271, 273.

While Weeks did object to the admission of the statistical analysis evidence, he failed to specify any reasons or authority regarding why the evidence should be excluded.   Rather, Weeks relied on sweeping conclusory statements that the serological statistical evidence is inadmissible.   For  example, Weeks stated in his motion to exclude:

> In order to make the complexity and multiplicity of their errors clear to the Court, the Defendant points out that after calculating the erroneous statistics for the serology analysis, Genelex went on to multiply that by the erroneous statistics for their DNA analysis. . .

Weeks' "objection" simply assumes, without proof, that the serology and DNA statistical probabilities are "erroneous." Moreover, **Weeks** motion in limine did not contain an objection to the combined statistical analysis evidence on a foundation basis, rather it set forth an argument that the evidence was prejudicial.

28

Simply objecting to evidence because it is prejudicial is not sufficient. State v. Arlington (1994), 265 Mont. 127, 150, 875 P.2d 307, 321, ("[p]rejudice in a criminal case will not be presumed, it must be established by the record. . . [that] the prosecution denied the defendant a substantial right"). Evidence offered by a litigant in support of, or in defense of its case usually is prejudicial to the other side's case. If it were not, there would be little reason to offer the evidence.

Pursuant to § 46-20-104(2), MCA, "[f]ailure to make a timely objection during trial constitutes a waiver of the objection, except as provided in 46-20-701(2)." Section 46-20-701(2), MCA, states that unless an objection is made, "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."

This Court will not consider issues raised for the first time on appeal when the appellant had the opportunity to make an objection at the trial level. State v. Webb (1992), 252 Mont. 248, 251, 828 P.2d 1351, 1353. We conclude that Weeks waived his objection to the statistical evidence regarding the serological testing by his failure to make a specific objection in his motion in limine and by his failure to make any objection at the admissibility hearing or at trial. Furthermore, Weeks failed to demonstrate that his substantial rights were prejudiced.

Moreover, having thoroughly reviewed the entire record, we are satisfied that while the foundation laid by the State for the combined statistical analysis evidence might have been more

detailed, there was no showing that such evidence was inaccurate, inherently unbelievable, unduly prejudicial or inflammatory. The combined statistical evidence was, in fact, consistent with and merely corroborative of other scientific, circumstantial and direct evidence in this case.

After considering all of Weeks' arguments concerning the admissibility of the DNA and serological evidence, we hold that the District Court did not abuse its discretion by admitting evidence of the DNA analysis and the statistical analysis conducted in this case.

## 4. MOTION FOR JUDGMENT OF ACQUITTAL

Weeks maintains that the District Court erred when it denied his motion to dismiss at the conclusion of the State's case. Weeks argues that there was insufficient evidence to convict him of the charge of sexual intercourse without consent because the State failed to prove that Weeks actually penetrated C.R. We disagree.

Pursuant to § 46-16-403, MCA, a district court may dismiss a criminal action at the close of the State's case when the evidence is insufficient to support a verdict of guilty. This Court has previously held that a trial court should grant a motion for a directed verdict of acquittal only when there is no evidence to support a guilty verdict. State v. Mergenthaler (1994), 263 Mont. 198, 203, 868 P.2d 560, 562-63. The standard of review for a directed verdict of acquittal, is "whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

30

beyond a reasonable doubt." State V. Bower (1992), 254 Mont. 1, 6, **833** P.2d 1106, 1110.

Weeks was charged under § **45-5-503,** MCA (1991), which provides:

> **Sexual intercourse without consent.** (1) A person who knowingly has sexual intercourse without consent with another person commits the offense of sexual intercourse without consent. . .

"Sexual intercourse" is defined at § 45-2-101(61), MCA (1991), for purposes of this case as:

> [P]enetration of the vulva, . . . of one person by the penis of another person. . Any penetration, however slight, is sufficient.

The record in this case evidences the following facts regarding penetration: (1) C.R. testified that Weeks had sexual intercourse with her several times a week from the time she was eight years old until she left the home; (2) C.R. testified that she knew Weeks was the father of the baby because she did not have sexual intercourse with anyone else; (3) C.R. testified she learned what the term sexual intercourse meant after speaking with a worker at the Florence Crittenton Home, and that was what Weeks was doing with her; (4) C.R. had a baby, and the statistical interpretation of the DNA analysis demonstrated that Weeks was 154,000 times more likely than a random man to be the father of the child, and the combined statistical analysis of the serological and DNA testing indicated that Weeks was 1.9 million times more likely to be the father of the baby than a random man.

Based on the above, we conclude that the State provided sufficient evidence upon which a rational trier of fact could find

31

Weeks penetrated C.R.   Therefore  we  hold  the  District  Court properly denied Weeks' motion for a directed verdict of acquittal.

## 5. PRIOR SEXUAL ABUSE

The final issue Weeks raises on appeal is whether the District Court abused its discretion when it excluded evidence of prior sexual abuse of C.R.   Pursuant to § 45-5-511(2), MCA, the rape shield statute, the State moved to limit evidence of C.R.'s prior sexual conduct, except evidence of prior conduct which was relevant to show the origin of her pregnancy, or evidence of C.R.'s past sexual conduct with Weeks.   The court granted the motion, limiting defense counsel from presenting any evidence of C.R.'s past sexual conduct,  except for evidence of sexual conduct within the time frame for the period of conception.   Before trial, the State moved that Weeks' witnesses be interviewed in chambers prior to testifying to ensure compliance with the court's order.   The court granted the motion.

Accordingly, outside the presence of the jury, Weeks presented the testimony of two potential witnesses: thirteen year old G.Q., and fourteen year old N.H.   N.H. stated that in the fall of 1991, C.R. had told her that C.R.'s brother was having sex with her. N.H. also related that C.R. told her that C.R.'s brother made C.R. undress in front of him and his friends.   However, N.H. did not know when the alleged incidents occurred.

G.Q. related that in October of 1991, C.R. told her that C.R.'s brother had forced C.R. to go to bed with him.  According to G.Q., C.R. said this incident had occurred a few nights before.

32

G.Q. also stated that C.R. had told her that her brother, and "Gordon," an adult male, had intercourse with C.R. on several occasions. When asked if C.R. had ever mentioned anything about Weeks, G.Q. related that C.R. told her that Weeks "was the nicest person."

The District Court would not allow N.H. to testify, because the defense could not establish that the conduct between C.R. and her brother occurred within the general parameters of the conception period. Therefore, the court ruled N.H.'s testimony was impermissible under the rape shield statute. The court limited G.Q.'s testimony to the incident which occurred in October of 1991; that C.R.'s brother had forced her to go to bed with him. The court excluded the remainder of G.Q.'s testimony, ruling that it was irrelevant and violative of the rape shield statute. On appeal, Weeks argues that the court's rulings violated his due process rights because he was not able to challenge the credibility of C.R.

Section 45-5-511(2), MCA, prohibits evidence concerning the sexual conduct of the victim of a sexual crime, "except evidence of the victim's past sexual conduct with the offender or evidence of specific instances of the victim's sexual activity to show the origin of semen, pregnancy, or disease which is at issue in the prosecution." The purpose of the rape shield statute is to prevent the trial from becoming a trial of the victim. State v. Steffes (1994) _____ P.2d _____, 51 St.Rep. 1463, 1469. It is well established that inadmissible evidence concerning sexual conduct of

33

the victim includes prior sexual abuse. State v. Lamb (1982), 198 Mont. 323, 646 P.2d 516; State v. Rhyne (1992), 253 Mont. 513, 519, 833 P.2d 1112, 1116; Steffes, 51 St.Rep. at 1469.

However, the protection of victims under the rape shield statute must be balanced against the defendant's right to confront witnesses. Steffes, 51 St.Rep. at 1469-70. This Court has determined that defendant's right to confront witnesses is not abridged by the exclusion of evidence of the victim's prior sexual abuse unless the victim's accusations or allegations of prior sexual abuse have been proven to be false. State v. Van Pelt (1991), 247 Mont. 99, 104, 805 P.2d 549, 552.

In this case, Weeks failed to demonstrate how his rights were abridged. The District Court allowed G.Q. to testify concerning the incident which occurred within the conception time period. The court concluded that this testimony was relevant to establish that the origin of C.R.'s pregnancy could have been someone other than Weeks, even though the genetic tests excluded C.R.'s brother as the possible father of the child. The remainder of the proposed evidence was clearly violative of the rape shield statute.

The determination of admissibility under the statute is left to the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. Van Pelt, 805 P.2d at 552. Upon review, we hold that the District Court did not abuse its discretion in excluding the evidence of prior sexual abuse which would not demonstrate the origin of C.R.'s pregnancy.

In conclusion, after considering all of the issues raised by

34

Weeks, we hold that the District Court did not commit reversible error as to any issue raised on appeal.  Accordingly, Weeks conviction is AFFIRMED.

_____
Justice

We   Concur:

_____
Chief Justice

_____

_____

_____
Justices