FILED

06/03/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0017

DA 23-0017

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 115

---

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

DARREN CHARLES DEMARIE,

      Defendant and Appellant.

---

APPEAL FROM:   District Court of the Third Judicial District,
In and For the County of Powell, Cause No. DC-21-47
Honorable Ray Dayton, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

         Nathan D. Ellis, Ellis Law, PLLC, Helena, Montana

      For Appellee:

         Austin Knudsen, Montana Attorney General, Tammy K Plubell, Assistant Attorney General, Helena, Montana

         Kathryn McEnery, Powell County Attorney, Patrick Moody, Special Deputy Powell County Attorney, Deer Lodge, Montana

---

Submitted on Briefs:  February 5, 2025

Decided:  June 3, 2025

Filed:

_____
               Clerk

Chief Justice Cory J. Swanson delivered the Opinion of the Court.

¶1　Following a bench trial in the Third Judicial District Court in Powell County, the Defendant, Charles DeMarie, was found guilty of Conspiracy to Commit Escape and Conspiracy to Commit Tampering With or Fabricating Physical Evidence. DeMarie was sentenced to 8 years at the Montana State Prison (MSP) for each count, to run concurrently with each other and consecutively to his prior prison sentence. DeMarie appeals his conviction and his sentence. We affirm.

¶2　We restate the issues on appeal as follows:

*Issue One: Whether DeMarie was illegally sentenced for conspiracy to escape based on his religious beliefs.*

*Issue Two: Whether the State presented sufficient evidence DeMarie conspired to tamper with or fabricate physical evidence.*

*Issue Three: Whether Demarie was entitled to pretrial credit for time served when he was held on his prior prison sentence and not held on a bond on his new charges.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3　In 1992, DeMarie was sentenced to 100 years in prison for deliberate homicide, with an additional 10-year-sentence enhancement for use of a weapon, with an expected discharge in 2037, absent parole.[1] In 2008, DeMarie became parole eligible, but was

---

[1] At the time of his sentencing, § 53-30-105(1), MCA (1991), allowed for good time credit towards a sentence. This was repealed in 1995, but the credit still applies to sentences imposed prior to its repeal. Section 53-30-105, MCA (1995) (1995 Mont. Laws, ch. 372, §§ 12(2), 13, repeal eff. Oct. 1, 1997). The statute permitted the Department of Corrections to grant good time allowance to inmates for good behavior, but it limited the allowance to 1 day for each day served in custody. The statute provided "In the event of an attempted escape by an inmate . . . the inmate may be punished by the forfeiture of part or all good time allowances." Section 53-30-105(2), MCA (1995). The record does not reflect whether DeMarie's good time credit was recalculated due to his conviction.

consistently denied parole. Realizing he might not be paroled anytime soon, he decided to escape.

¶4 In mid-2018, DeMarie obtained an unauthorized cellphone, and used the phone to contact two former prisoners, Ernest Gates and Jared Hoehne. DeMarie arranged for Gates to drive from his residence in Tennessee to Montana to pick up DeMarie after his escape from prison. Gates was supposed to help DeMarie flee the state. The two discussed recruiting others to join a paramilitary group, training with weapons, and surviving in the wild. To facilitate this plan, DeMarie gave Hoehne $5,000 to purchase equipment, clothing, and military style Meal, Ready-to-Eat (MRE) packets. Although he agreed to procure these items, Hoehne testified at DeMarie's trial he spent DeMarie's money on camping equipment for himself and his family.

¶5 In 2019, DeMarie was placed in the Work Reentry Center. The center sits outside the main prison fences on MSP grounds. DeMarie received a relatively more privileged job as a driver, transporting other inmates around MSP grounds. Using his cell phone, he exchanged information with Gates, sending Gates maps and establishing a meet-up location outside the prison. The date for the escape was set for February 15, 2019. Gates left Tennessee on February 8. He provided DeMarie with periodic updates, writing "33° here in Arkansas," "I am in Colorado," "21 here, still in Colorado" "but very near Wyoming." On February 13, Gates arrived in Deer Lodge. Gates continued to send text messages to DeMarie's phone until that evening.

¶6 However, DeMarie no longer had his phone. In early February, the prison staff became concerned with DeMarie's behavior. He had been giving away his personal

3

property to other inmates. The guards searched DeMarie's prison cell and located several items which indicated a plan to escape. The guards also found a list with names, addresses, and phone numbers of MSP staff, the Yellowstone County attorneys who prosecuted him in his homicide case, and the names of the members of the parole board. The guards discovered information about firearms and papers with words translated from Russian to English. Based on this information, the Correctional Unit Manager had DeMarie transferred to more secure housing and out of the Work Reentry Center. DeMarie lost access to his cell phone, which was hidden in the van he used for his job. He was therefore unable to inform Gates about his changed circumstances. After DeMarie failed to show up at the rendezvous location or communicate with him, Gates drove home to Tennessee.

¶7 During an interview with prison staff, on February 28, 2019, DeMarie deflected questions about the discovered items by stating he was a "prepper" and believed the end times were near. He stated he attempted to learn to speak Russian. Upon his release from the secure unit in March 2019, DeMarie was transferred to Crossroads Correctional Center (CCC) in Shelby, Montana. Using an assigned telephone pin number, as well as the pin number of another inmate, DeMarie renewed contact with Gates. Their phone conversations were recorded. On April 11, 2019, DeMarie told Gates he had been transferred to CCC. DeMarie provided Gates with a password, which would get him "to the secret sailor paradise." He told Gates he could not get to his cell phone, which was hidden in a "transitory place"; DeMarie cautioned Gates the phone was not well hidden and could be discovered. He instructed Gates to delete his Facebook and Messenger social media accounts. In exchange, DeMarie promised Gates money. During a subsequent

4

phone call on May 13, Gates informed DeMarie he was unable to delete the accounts, and hoped another prisoner would find the phone and erase its data so that prisoner could use the phone for himself. DeMarie replied "that would work" too.

¶8 DeMarie's hopes would not come to fruition. In May 2019 another inmate found his phone and turned it over to the guards. The phone was quickly connected to DeMarie. The phone contained the detailed plans DeMarie had made with Gates for the escape, as well as a photograph he took of his face, referred to as a "selfie" in the parlance of our times. On December 5, 2019, DeMarie sent a letter to the Powell County Attorney's office, asking if there was an active investigation against him. The office replied on December 13, stating "there are no charged felonies against [him]" and it was "unaware whether any law enforcement agency [was] investigating [him] for potential crimes."

¶9 On March 21, 2021, the State filed an Information charging DeMarie with: (I) Conspiracy to Commit Escape, (II) Transferring of Illegal Articles (cell phone), (III) Conspiracy to Commit Tampering With or Fabricating Physical Evidence, and (IV) Solicitation to Commit Unlawful Possession of a Firearm by a Convicted Person.

¶10 At a bench trial, Gates and Hoehne testified on behalf of the State. Gates had been prosecuted by that time and had pleaded guilty. He testified he exchanged messages with DeMarie, he showed up at the rendezvous point, and DeMarie failed to appear. Gates stated DeMarie subsequently requested he delete the Facebook account. Hoehne confirmed the two discussed purchasing guns, but Hoehne did not confirm he had agreed to do so on DeMarie's behalf. Additionally, Hoehne testified he would not have given DeMarie a gun, and he took DeMarie's money and spent it on himself.

5

¶11    DeMarie testified in his own defense.  He effectively conceded he attempted to escape.  He testified he believed Ukrainian political leaders were attempting to inflict a "genocide" on ethnic Russians living in the Russian-occupied Ukrainian territories of Donbas and Luhansk.[2]  DeMarie stated he prayed, and he felt God revealed the escape plan to him and provided a path of spiritual atonement by fighting on the pro-Russian side of the conflict.  He contacted family and friends in Europe, as well as the "Luhansk People's Republic," with an intention to join the war.  DeMarie testified the election of Russian President Vladimir Putin signaled the beginning of the "age of gentiles" and Jesus Christ would return to Earth at the end of the age.  DeMarie stated he planned to take back the money he sent to Hoehne, and he planned to use the money to support himself in Ukraine.  He expected to reach Ukraine by contacting the Russian Embassy and securing a diplomatic flight to the region.

¶12    In its closing, the State conceded it did not prove Count II, Transferring of Illegal Articles.  The District Court dismissed the charge.  During its pronouncement of the verdict, the court also noted it did not believe Hoehne's testimony, "I wish Mr. Hoehne all the luck in the world in his new life, but I wouldn't buy a used car from him."  This doubt led the court to acquit DeMarie on Count IV, Solicitation to Commit Unlawful Possession of a Firearm by a Convicted Person.

---

[2] This appears to be a genuine belief held by some members of the Russian Orthodox Church. *See* Chawrylo, Katarzyna. *A holy war. The Russian Orthodox Church blesses the war against the West*, Centre for Eastern Studies, no. 589, at 2 (April 12, 2024) https://perma.cc/7LK5-Y8ZH.

¶13 However, the court found the defendant guilty on the remaining counts. On Count I, Conspiracy to Commit Escape, DeMarie did not contest he attempted to escape. On Count III, Conspiracy to Commit Tampering With or Fabricating Physical Evidence, the District Court found the evidence showed DeMarie believed he either was or soon would be under investigation for trying to escape. The court recounted the evidence presented against DeMarie on which he based this decision:

> He needed to get that . . . cell phone data deleted. [H]e got a hold of Gates and got Gates to do it. Gates tried to do it. Certainly, there was an act of furtherance. There was a plan to . . . tamper with or destroy the evidence . . . , an act of furtherance was committed . . . , and he's guilty of the Conspiracy to Commit Tampering with the Evidence.

¶14 At the sentencing hearing, DeMarie asked for a suspended sentence. DeMarie conceded he was likely to serve out the remainder of his original sentence without parole; if he received a consecutive sentence of imprisonment, he would likely never leave prison. DeMarie also explained to the judge he was a "devout follower of God." He stated he wanted to gain citizenship in Hungary, and he could do so by fighting in Ukraine which "was the price of admission."

¶15 The court sentenced DeMarie to 8 years in prison for Counts I and III, concurrent to each other but consecutive to his original sentence. In explaining the reason for its sentence, the District Court first stated it was not sentencing DeMarie because of his religious or political beliefs, then explained DeMarie's conduct made this a very serious escape offense:

> I'm not sentencing you for your attitudes, . . . your philosophies, . . . your religious beliefs, your political beliefs[,] your aspirations of what you might do if you weren't in prison. I'm not sentencing you for any of that.

7

. . .

Is this the 3 year guy walk away from a Pre-Release or is it a much more serious type situation? You're on the high end of serious when it comes to escape or attempted escape.

. . .

[Y]ou had . . . this plan. You involved others. You, you obtained money. . . . [A]llegedly . . . , arrangements were made for a weapon. [Y]ou got this guy to come from Tennessee. He actually did. . . . It was a very, very involved deal. You're on the high end of the continuum when I'm looking at one escape versus another one.

. . .

In your particular case suspended time does not make any sense to me at all. . . . [A] suspended sentence is for a guy who tells me, convinces me that, you know, let me do my time or don't make me do any time, put me on supervision, . . . where I can integrate myself back into . . . society, be a law-abiding guy. That's not your plan. . . .
You want to go to the Ukraine . . . , or Russia and get involved in the war. You know, why would I put you on a suspended sentence? It makes no sense at all.

The District Court did not grant DeMarie any credit for time served because he had been serving his original prison sentence the entire time, and was not held on bail on the new criminal charges.

¶16 DeMarie now appeals to this Court, arguing the District Court violated his First Amendment rights when he referenced his wish to fight in Ukraine during sentencing. Additionally, DeMarie argues the State failed to show he had the intent to tamper with evidence. Lastly, he argues he is entitled for pretrial credit for time served in custody.

**STANDARD OF REVIEW**

¶17 This Court reviews a district court's sentence for legality. *State v. Spagnolo*, 2022 MT 228, ¶ 4, 410 Mont. 457, 520 P.3d 330. This Court will "review any sentence

8

imposed in a criminal case, if it is alleged that such sentence is illegal or exceeds statutory mandates, even if no objection is made at the time of sentencing." *State v. Lenihan*, 184 Mont. 338, 343, 602 P.2d 997, 1000 (1979). The legality of a sentence is reviewed de novo as it presents a question of law. *Spagnolo*, ¶ 4. Claims a sentence violates a constitutional provision are reviewed de novo. *State v. Tam Thanh Le*, 2017 MT 82, ¶ 7, 387 Mont. 224, 392 P.3d 607. If a legal sentence was not properly presented or objected to below, this Court will only conduct a plain error review. *See Lenihan*, 184 Mont. at 343, 602 P.2d at 1000.

¶18   "We review a challenge to the sufficiency of evidence to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Michelotti*, 2018 MT 158, ¶ 9, 392 Mont. 33, 420 P.3d 1020.

¶19   Montana law "affords a sentencing court no discretion when granting credit for time served." *Spagnolo*, ¶ 5 (citations omitted). We review de novo a district court's calculations on time served. *Spagnolo*, ¶ 5 (citations omitted).

## DISCUSSION

¶20   *Issue One: Whether DeMarie was illegally sentenced for conspiracy to escape based on his religious beliefs.*

¶21   We first must address whether this issue is properly preserved on appeal. DeMarie argues his sentence was illegal under the First Amendment to the United States Constitution, Article II, Sections 5 and 6, of the Montana Constitution, and § 46-18-101(3)(c), MCA. As a prudential matter, this Court does not review an issue to

9

which a party failed to object at the district court, unless it involves a criminal sentence that "is alleged to be illegal or in excess of statutory mandates . . . ." *State v. Kotwicki*, 2007 MT 17, ¶ 8, 335 Mont. 344, 151 P.3d 892. Here, the maximum sentence that could be imposed for an escape, without a threat of force, and while incarcerated for a felony, was 10 years; thus, DeMarie's 8-year sentence falls within the statutory parameters. Section 45-7-306(3)(b), MCA.

¶22 The State argues DeMarie failed to object during trial and subsequently failed to request plain error review of this issue. DeMarie argues he twice interjected into the court's oral pronouncement of his sentence, and this Court should consider that a valid objection, or attempt at an objection, which preserved the appeal.

¶23 DeMarie claims he "clearly was trying to voice his objections to the sentencing court's illegal religious discrimination" when he twice interjected as the court pronounced his sentence. But DeMarie shows no evidence these interjections were an attempt to object to the sentence. The context of these interjections casts doubt on DeMarie's assertion they were objections.

¶24 DeMarie first interjected "I don't follow" as the court compared the gravity of his attempted escape to "a walk away from Pre-Release." It is a great leap to conclude DeMarie was objecting to the court's "illegal religious discrimination." DeMarie again tried to interrupt after the court referenced DeMarie's wish to go and fight in Donetsk and Luhansk, stating "well sir . . ." before being cut off by the court. The court then explained the pronouncement of the sentence is not a conversation and DeMarie cannot speak during the court's pronouncement. DeMarie did not subsequently object to the sentence.

10

¶25 As a prudential matter, this Court declines to consider issues that were not presented to a district court, as "it is fundamentally unfair to fault the trial court for failing to rule on an issue it was never given the opportunity to consider." *State v. LaFreniere*, 2008 MT 99, ¶ 11, 342 Mont. 309, 180 P.3d 1161 (citation omitted). An objection must be specific, including invoking what rule or law may be in violation, for a trial court to be appraised of the issue, to rule on the issue, and for the objecting party to preserve the issue for appeal. *LaFreniere*, ¶ 12 (citation omitted); *see also State v. Weeks*, 270 Mont. 63, 85, 891 P.2d 477, 490 (1995) ("broad general objections do not suffice"). Here, DeMarie's interjections can hardly be described as objections to begin with, and do not meet the requirements for specificity. Saying "I don't follow" and "well sir" fails to meet the requirements for an objection. These words do nothing to provide the sentencing court sufficient notice to distinguish between a legal objection and an unhappy dispute uttered by a convicted person who is being sent to prison. While we do not require DeMarie to use the formal language of the bar, the objection must be specific enough to allow a judge to rule on it. This objection, if such it was, did not meet that specificity or notice requirement, and DeMarie lost his chance to appeal it.

¶26 DeMarie also argues the sentence was illegal and this Court can review it because it violated his constitutional rights to religious freedom. This Court has repeatedly held it will "review any sentence imposed in a criminal case, if it is alleged that such sentence is illegal or exceeds statutory mandates, even if no objection is made at the time of sentencing." *Lenihan*, 184 Mont. at 343, 602 P.2d at 1000. This Court has subsequently held "a sentence is not illegal if it falls within statutory parameters." *Kotwicki*, ¶ 13. A

11

constitutional challenge to a sentence may be facial or as-applied, and we treat them differently on appeal. "[A] claim that a statute authorizing a sentence is unconstitutional on its face may be raised for the first time on appeal." *State v. Ber Lee Yang*, 2019 MT 266, ¶ 10, 397 Mont. 486, 452 P.3d 897 (citation omitted). An as-applied constitutional challenge to a sentence must be raised at the district court level, or it is waived on appeal. *Ber Lee Yang*, ¶ 11. A defendant's as-applied constitutional challenge is based on the defendant's allegation that his *sentence* is unconstitutional, although imposed pursuant to a constitutional sentencing statute." *Ber Lee Yang*, ¶ 11 (emphasis in original).

¶27 DeMarie is not challenging the constitutionality of the statute under which he was sentenced. As explained above, he failed to properly object to the District Court, and now presents the First Amendment issue for the first time on appeal. This is an as-applied challenge, and we will not review the appellant's allegation of a First Amendment violation except for under the plain error doctrine.

¶28 Finally, we come to the question of reviewing the sentence under the plain error doctrine. "When reviewing unpreserved claims of error, we employ the plain error doctrine sparingly, on a case-by-case-basis, considering the totality of circumstances of each case." *State v. George*, 2020 MT 56, ¶ 5, 399 Mont. 173, 459 P.3d 854 (citation omitted, internal quotations omitted). Simply asking this Court to "review an unpreserved issue under the plain error doctrine is not enough." *George*, ¶ 5 (citation omitted). The defendant must firmly convince this Court "the claimed error implicates a fundamental right and [plain error review] is necessary to prevent a manifest miscarriage of justice or that failure to review the claim may leave unsettled the question of fundamental fairness of the

12

proceedings or may compromise the integrity of the judicial process." *George*, ¶ 5 (citation omitted).

¶29 In his principal brief, DeMarie argues he preserved his objection for appeal. He does not invoke plain error review, nor even mention *Lenihan* review. The State urges the Court to take DeMarie at his argument, and not beyond, and decline to exercise plain error review if it was not requested. Then in his reply brief, DeMarie requests the Court review the legality of his sentence under *Lenihan*. "It is improper for us to consider an issue that is raised for the first time in a reply brief." *State v. Johnson*, 2010 MT 288, ¶ 13, 359 Mont. 15, 245 P.3d 1113 (citation omitted). In addition, we previously refused to invoke the common law doctrine of plain error review when a party raises such request for the first time in his reply brief. *Johnson*, ¶ 13. We decline to invoke plain error review.

¶30 In declining plain error or *Lenihan* review of the defendant's sentence, we do so based on our review of the record and confident it will not result in a miscarriage of justice or subject DeMarie to a fundamentally unfair proceeding. The District Court gave a thorough explanation for the sentence it imposed, basing the sentence upon the scale and extent of DeMarie's illegal conduct and plan to escape from prison. The First Amendment does not protect the actions DeMarie took in furtherance of his escape, even if motivated by his religious belief.

¶31 The District Court imposed a lawful sentence for reasons supported by the record. DeMarie failed to adequately object at sentencing, and did not preserve his as-applied constitutional challenge for appeal. He also failed to invoke plain error review by this Court. We find no fundamental unfairness or miscarriage of justice in his sentencing

13

proceedings which would compel us to invoke plain error review. We hold the District Court imposed a lawful sentence.

¶32    *Issue Two: Whether the State presented sufficient evidence DeMarie conspired to tamper with or fabricate physical evidence.*

¶33    When reviewing a guilty verdict, this Court determines "whether sufficient evidence supports it, not whether the evidence supports a different conclusion or verdict." *State v. Daniels*, 2019 MT 214, ¶ 42, 397 Mont. 204, 448 P.3d 511 (citation omitted; internal quotations omitted). To succeed on a claim of insufficient evidence, the defendant must convince the appellate court, "viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could not find the essential elements of the crime beyond a reasonable doubt." *State v. Ohl*, 2022 MT 241, ¶ 8, 411 Mont. 52, 521 P.3d 759.

¶34    In the present case, DeMarie challenges his conviction of Conspiracy to Commit Tampering with or Fabricating Physical Evidence.

> (1) A person commits the offense of tampering with or fabricating physical evidence if, believing that an official proceeding or investigation is pending or about to be instituted, the person:
> (a) alters, destroys, conceals, or removes any record, document, or thing with purpose to impair its verity or availability in the proceeding or investigation . . . .

Section 45-7-207(1), MCA. The statute on conspiracy states:

> (1) A person commits the offense of conspiracy when, with the purpose that an offense be committed, the person agrees with another to the commission of that offense. A person may not be convicted of conspiracy to commit an offense unless an act in furtherance of the agreement has been committed by the person or by a coconspirator.

Section 45-4-102(1), MCA. DeMarie argues he did not believe an official proceeding was pending when he told Gates to delete his Facebook and Messenger accounts. Instead,

14

DeMarie intended to delete his account so his Facebook friends would not be worried about him because he was not replying to their messages. The District Court found that argument unpersuasive, and we agree.

¶35 While DeMarie argues he thought the investigation into the escape was concluded when he left the secured facility, his phone calls to Gates show otherwise. During the April 11 phone call, DeMarie stated he needed Gates's help.

> Apparently, they got nothing . . . . The device has not been recovered to my knowledge. It's still hidden. But, I'm concerned. . . . It was like in a transitional place. So, it's hid, how good I couldn't tell.

DeMarie then proceeded to provide the password to Gates and directed Gates to "delete all accounts . . . Messenger and FB." Acknowledging the investigators probably "had nothing," DeMarie was concerned with the phone's inevitable discovery, as the phone was poorly hidden in a "transitional" place. He told Gates "if they got that device, it might not be so nice, because we were discussing some things on there and there's some stuff on there like, I don't know, maps." Gates suggested sending a message which would state "there was no way he can do it." Later during the call, Gates, uncertain of what DeMarie was saying, asked "What do you need me to do?" DeMarie responded, "Take care of the secret sailor shit, shitcan D's accounts." Gates asked how to "retrieve the device," and DeMarie replied, "Oh you can't! But what you can do, is on the cloud part, you can kill FB and Messenger with that code word."

¶36 In a subsequent call, on April 14, DeMarie stated to Gates on the phone, "I'm under investi . . . ," cutting himself off in the middle of the word 'investigation.' Gates told

15

DeMarie he should only call him in a couple of weeks using someone else's PIN, to help disguise their efforts to delete the Facebook account and collecting evidence.

¶37    In a third conversation, on May 13, Gates told DeMarie he was unsuccessful in deleting the account. They both concluded the phone had probably not yet been discovered, and Gates mused the best outcome was for another prisoner to find it and wipe its memory to use the phone himself. DeMarie responded "That will work too."

¶38    A rational trier of fact could easily find DeMarie's efforts were driven by an intent to delete incriminating evidence before it was discovered, and not an attempt to ease the worry of his Facebook friends, who were wondering why he was not responding. DeMarie's statement agreeing that erasing the phone data "would work too" demonstrates his objective was to remove evidence of the escape. DeMarie expressed worry about the impending criminal charges that would result from discovery of the phone. Not once did he express concern over the dead Facebook account causing his friends to worry.

¶39    DeMarie argues a letter he received from the County Attorney demonstrates he did not believe an investigation was pending or about to be instituted. That letter was received in December 2019, 8 months after the phone calls with Gates. A rational trier of fact could easily find the prosecutor's letter could not erase DeMarie's belief—8 months earlier—he was under investigation when he called Gates. To the contrary, it should show to a rational trier of fact DeMarie still believed an investigation was pending or would be instituted, even months after the attempted data deletion.

¶40    DeMarie also argues destruction of evidence which *could* lead to an investigation is not covered by the scope of § 45-7-204, MCA, and DeMarie believed the investigation had

16

already been concluded. The plain text of the statute states a defendant must believe "that an official proceeding or investigation is pending or *about to be instituted*." Section 45-7-207(1), MCA (emphasis added). We have held the State must prove a "defendant had knowledge of or *believed* an official proceeding or investigation was pending or imminent." *Daniels*, ¶ 45 (emphasis added).

¶41 DeMarie's own words showed he believed the phone's discovery was imminent. He did not believe the investigation was concluded, because he stated to Gates the phone was likely still hidden and not yet discovered. He explained the evidence on the phone would "not be so nice" for him. He acknowledged the additional prison time he might face when the evidence on that phone was discovered. For DeMarie to now claim he did not believe in the impending discovery of his phone—and the investigation that would result from that discovery—flies in the face of his own words.

¶42 The District Court heard more than sufficient evidence to convict DeMarie of Conspiracy to Commit Tampering With or Fabricating Physical Evidence.

¶43 *Issue Three: Whether Demarie was entitled to pretrial credit for time served when he was held on his prior prison sentence and not held on a bond on his new charges.*

¶44 DeMarie argues he is entitled to credit for time he served in prison while his matter was pending. Time credit is governed by § 46-18-201, MCA. The statute states:

> (9) When imposing a sentence under this section that includes incarceration in a detention facility or the state prison, as defined in 53-30-101, the court shall provide credit for time served by the offender before trial or sentencing.

Section 46-18-201(9), MCA. This Court addressed the language of this statute in *Killam v. Salmonsen*, 2021 MT 196, 405 Mont. 143, 492 P.3d 512, and *State v. Mendoza*,

17

2021 MT 197, 405 Mont. 154, 492 P.3d 509, a pair of cases that were joined for oral argument and decided in conjunction with each other. In *Killam*, a defendant was out on parole when he committed a crime. He was served an arrest warrant for both the new crime and for his parole violation proceedings. *Killam*, ¶ 3. The district court denied the credit, but we reversed, holding the new version of the statute required credit for time served on the charge, notwithstanding other concurrent holds against the defendant. *Killam*, ¶ 19.

¶45 In *Mendoza,* the defendant failed to appear at a hearing and a warrant was issued for his arrest. *Mendoza*, ¶ 4. Upon his arrest for a different subsequent offense, the warrant was served on the defendant. *Mendoza*, ¶ 4. The district court did not grant Mendoza credit, deciding instead to "let the supreme court sort this out." *Mendoza*, ¶ 5. This Court held Mendoza was entitled to credit for the entire time he served incarcerated on the initial charge, even though he was concurrently being held on a different charge. *Mendoza*, ¶ 12.

¶46 In both cases, this Court found that a defendant was entitled to time credit, even though he was concurrently held on a different and unrelated offense. That time credit was calculated by adding up the days the defendant spent in jail from the moment the defendant was served his arrest warrant to the day of his sentencing or release on bail.

¶47 This case is different. DeMarie was already adjudicated on the offense for which he was imprisoned, and he committed his second crime while incarcerated. Unlike *Killam* and *Mendoza,* DeMarie was never detained for his escape and tampering charges.

¶48 More analogous to DeMarie's case is our holding in *Boyland v. Salmonsen*, No. OP 23-0386, Order, 413 Mont. 532, 535 P.3d 1132, (August 29, 2023). In *Boyland*, the defendant was already convicted and serving time for an offense when he assaulted

18

another inmate.  *Boyland*, at *1.  During sentencing, the judge did not grant Boyland any time credit.  *Boyland*, at *2.  On appeal, the State argued, since Boyland was never served an arrest warrant, he was never arrested, and his new charges resulted in no restrictions on his liberty.  *Boyland*, at *3.  Therefore, he was not entitled to time credit.  *Boyland*, at *3.  Through an Order, this Court dismissed Boyland's writ of habeas corpus and denied credit for time served, finding the State's arguments dispositive.  *Boyland*, at *4.

¶49    *Boyland*'s holding is further reinforced by our recent decision in *State v. Pillans*, 2025 MT 100, 422 Mont. 1, ___ P.3d. ___.  There, we addressed a situation where a defendant was out on bail when he was arrested on a second unrelated offense.  *Pillans*, ¶ 21.  Later, Pillans was released from detention on that second offense.  *Pillans*, ¶ 21.  However, at no point during this detention was Pillans's prior bail revoked, and no arrest warrant issued against him for his prior offense.  *Pillans*, ¶ 21.  We concluded  Pillans did not earn any credit for time served on his first offense while he was jailed for his subsequent offense.  *Pillans*, ¶ 21.  "There is nothing in the record of [the first offense] to indicate that [the subsequent arrest] was related in any way to [the first offense]."  *Pillans*, ¶ 21.  "In short, the correct test is, looking *only* at the record in the sentencing case, whether the sentencing court had jurisdiction over the defendant because of the case, and the defendant was detained pursuant to that jurisdiction."  *Pillans*, ¶ 20 (emphasis in original).

¶50    Facing a similar situation to *Boyland* and *Pillans*, we conclude DeMarie is not entitled to credit for time served.  Looking only at the record of his attempted escape and tampering case, nothing in the record indicates DeMarie was detained pursuant to this case.  DeMarie was never served with a warrant.  Thus, DeMarie did not serve any time in relation

19

to this case. Instead, DeMarie's liberty was only restrained by his prison sentence for his prior homicide conviction.

## CONCLUSION

¶51    For the forgoing reasons, the District Court is affirmed.

/S/ CORY J. SWANSON

We Concur:

/S/ KATHERINE M BIDEGARAY
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON
/S/ JIM RICE